Filed:  January 28, 2005

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 04-14
(CA-00-762-1)

STEVEN VAN MCHONE,

Petitioner - Appellant,

versus

MARVIN POLK, Warden, Central Prison,
Raleigh, North Carolina,

Respondent - Appellee.

O R D E R

The court amends its opinion filed December 28, 2004, as follows:

On page 22, first full paragraph, line 5 -- the word "district" is corrected to read "trial."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEVEN VAN MCHONE,
        *Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina,
        *Respondent-Appellee.*

No. 04-14

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-00-762-1)

Argued: September 28, 2004

Decided: December 28, 2004

Before WILKINS, Chief Judge, and LUTTIG and
GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Wilkins concurred. Judge Gregory wrote a separate
opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Cynthia Francine Adcock, Chapel Hill, North Carolina,
for Appellant. Valerie Blanche Spalding, NORTH CAROLINA

DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Kenneth J. Rose, CENTER FOR DEATH PENALTY LITIGATION, INC., Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

## OPINION

LUTTIG, Circuit Judge:

Petitioner, Steven Van McHone, appeals from the district court's denial of his 28 U.S.C. § 2254 habeas petition. In accordance with 28 U.S.C. § 2253(c), we granted McHone a certificate of appealability in order to address the claims he raises under *Brady* v. *Maryland*, 373 U.S. 83 (1963) and *Strickland* v. *Washington*, 466 U.S. 668 (1984). Because we conclude that the North Carolina Supreme Court's disposition of these claims was neither contrary to, nor an unreasonable application of, established federal law, we affirm.

I.

The North Carolina Supreme Court and the district court have thoroughly recounted the facts of Steven McHone's murders of his mother, Mildred Adams, and his stepfather, Wesley Adams, Sr., *see State of North Carolina* v. *McHone*, 435 S.E.2d 296, 298-301 (N.C. 1993); J.A. 817-22. We set forth only the facts relevant to the issues on appeal, as established by the witnesses who testified at McHone's trial.

Wendy Adams testified that at 12:30 a.m. on June 3, 1990 she, her husband Wesley Adams, Jr., their son Alex, and Wesley, Jr.'s parents Mildred Adams and Wesley Adams, Sr., returned to Mildred and Wesley, Sr.'s home after a day of fishing. Steven McHone, an occupant of the house, was already there. While getting Alex ready for bed, Wendy overheard Wesley, Sr. and Mildred arguing with McHone about money. Thereafter, Mildred came to their room inquiring about a missing pistol. Subsequently, Wesley, Jr. and Wendy

heard three gunshots. As Wesley, Jr. went out into the hall to investigate, Wendy heard someone coming up the basement stairs and then overheard Wesley, Sr. tell Wesley, Jr. to call 911.

Wesley, Jr., a Captain in the United States Air Force, testified that while he was talking with the 911 operator he briefly saw McHone wrestling with Wesley, Sr. before they disappeared from sight. About a minute later, Wesley, Sr. reappeared and told Wesley, Jr. that his mother was "face down out back." As Wesley, Sr. approached Wesley, Jr., McHone appeared in the doorway and shot Wesley, Sr. in the chest with a shotgun. Wesley, Jr., after a lengthy scuffle, managed to disarm McHone. Thereafter, McHone cursed at Wesley, Jr. and threatened that if Wesley, Jr. did not kill him he would hunt Wesley, Jr. and his family down and "finish them off." *McHone*, 435 S.E.2d at 299.

McHone did not dispute that he killed Mildred and Wesley, Sr. and assaulted Wesley, Jr. Rather, he presented a voluntary intoxication defense, claiming that his consumption of alcohol and LSD prevented him from forming the requisite mental state for first degree murder. During sentencing, McHone presented his impaired mental state in mitigation. McHone attempted to establish his impairment through the testimony of Jimmy McMillian and Tammy Bryant.

McMillian testified that over the course of June 2, 1990 he and McHone split one and one-half pints of Jack Daniels and that, in addition, McHone drank a pitcher of beer. McMillian testified that McHone's physical and mental faculties were appreciably impaired because he had a "slushy mouth." *Id*. at 300.

Bryant, McHone's girlfriend, testified that she saw McHone on the evening of June 2 at a party at the home of Ronald Speaks. Bryant testified that, when McHone arrived at the party, his speech was slurred and that he was staggering. She further testified that McHone got into a fight while at the party and began "swinging a gun around in everyone's face, threatening everybody, moving real swiftly and quickly." When Bryant asked McHone "what he was on," McHone responded, "I have taken a couple of hits of acid." *Id*.

McHone also presented expert testimony from Dr. James Groce and Dr. John Frank Warren, III. Both testified that McHone had a serious substance abuse problem. *Id.* at 301.

The state presented the testimony of Tammy Sawyers to rebut McHone's intoxication defense. Sawyers, who did not drink any alcohol on June 2, testified that she and McHone had a conversation while driving to Speaks' house and that McHone's speech was fine and that McHone was able to walk "fine" to and from her vehicle. She also testified that she was with McHone from 3:00 p.m. on June 2 until 2:00 a.m. the next morning, that she was never out of his presence for more than five minutes, and that she did not observe him take any controlled substances. *Id.*

The jury convicted McHone of two counts of first degree murder, one each for killing his mother, Mildred, and his step-father, Wesley, Sr. The jury also convicted McHone of one count of assault with a deadly weapon with intent to kill, for his attack on his step-brother, Wesley, Jr. After finding one aggravating factor and eleven mitigating factors as to the murder of Mildred, *id.* at 579-81, and two aggravating factors and ten mitigating factors as to the murder of Wesley, Sr., *id.* at 582-85, the jury recommended, and the trial court imposed, the death penalty for each first degree murder. *McHone*, 435 S.E.2d at 298. McHone unsuccessfully sought direct and post-conviction review in the North Carolina courts, *id.*; J.A. 731-775; *State of North Carolina* v. *McHone*, 539 S.E.2d 642 (N.C. 1999), and his federal habeas petition was denied on the merits by the district court. J.A. 873. Pursuant to the certificate of appealability issued by this court, the instant appeal followed.

## II.

McHone claims that the state's failure to disclose evidence located in State Bureau of Investigation (SBI) files entitles him to relief under *Brady* v. *Maryland*. McHone's *Brady* claims did not receive extensive treatment in the Superior Court and in the North Carolina Supreme Court. J.A. 774; *McHone*, 539 S.E.2d at 642 ("This court having thoroughly considered the matters raised . . . and having determined that none require further evidentiary hearing and that none merit any further grounds for relief, the motion is therefore denied."). Nonetheless,

the determination by those courts that McHone was not entitled to relief under *Brady* constitutes an adjudication on the merits of that claim. *See Bacon* v. *Lee*, 225 F.3d 470, 478 (4th Cir. 2000). Accordingly, under section 2254(d), we "confine our review to whether the [state] court's determination resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." *Bell* v. *Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000) (en banc). The district court concluded that petitioner did "not [meet] the AEDPA standards for this claim," and we agree.

In order for a petitioner to obtain relief under *Brady*, "(1) the evidence must be *favorable* to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; [and] (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial." *Monroe* v. *Angelone*, 323 F.3d 286, 299 (4th Cir. 2003); *Kyles* v. *Whitley*, 514 U.S. 419 (1995) (exculpatory evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the *result* of the proceeding would have been different.") (emphasis added). Materiality is not considered item by item, rather it must be assessed collectively. *Id.* at 436.

The district court assumed that the government did not turn over the evidence in question, J.A. 835, and we assume the same.

## A.

McHone identifies the statements of seven individuals — Wesley Adams, Jr., Wendy Adams, Randy Adams, Tammy Sawyers, Mark Tuttle, Deputy Inman, and William Kent Hall — that he contends were improperly withheld by the government.

As to the first statement, that of Wesley Adams, Jr., Officer L. Perry summarized Wesley, Jr.'s statement to investigators immediately after the crime as follows:

> Wes . . . overheard Steve and his mother quarreling in the kitchen. *Steve was obviously drunk* and was complaining to his mother that he wanted his money which she was holding for him. J.A. 617;

\* \* \*

Steve continued to argue with his mother and step-father. Wesley, Sr. told Steve to go downstairs in the basement and *sleep it off. Id.*;

\* \* \*

*Wes advised that he smelled a strong odor of alcohol on Steve on this occasion.* He was not aware of what amount Steve may have drunk or if he had taken any drugs. Steve was not stuttering and appeared to know what he was doing the entire time. He was able to fight both him (Wes) and his father and was able to "put up a pretty good fight." Steve was not remorseful at all after the shooting was over. Steve even told Wes . . . that "You'd better kill me or I'll come back and kill you, your wife, and child." *Id.* at 619[.]

Wesley, Jr. testified at McHone's trial. He testified as follows:

Q. *Did you notice any odor of alcohol about Steve that night? A. I didn't notice any.* Q. During this argument did you know that he had been drinking? A. The only indication I had, the only mention of drinking at all during the argument was the fact that my father told him to go to bed and sleep it off. *Id.* at 290;

\* \* \*

Q. Do you have an opinion . . . based on your experience [including substance abuse detection training in the Air Force] as to whether defendant was impaired . . . ? A. I neither heard, saw, or felt any type of impairment . . . By impairment I meant that any dysfunction of his physical movements; any slow movement, jerking, stumbling, tripping; any impairment in his voice characteristics by slurring his speech or not being able to finish a sentence.

*Id.* at 281-282; *see also id.* at 250-252 (testifying that McHone was "aware" and "responsive" while arguing with his parents and that he

did not have trouble walking to his room); *id*. at 271 (describing McHone's "acrobatic moves" during the scuffle); *id*. at 273-74 (testifying that McHone "put up a good fight"); *id*. at 279-280 (testifying that, during the 40 minutes that Wesley, Jr. fought and subdued McHone, McHone's speech was understandable, he easily handled the shotgun, and he was "extremely dexterous"); *id*. at 298-99 (testifying that Wesley, Jr.'s scuffle with McHone was extended because McHone was "in full control of his faculties").

In material respects, Wesley, Jr.'s pretrial and trial statements are consistent, even if at first blush, as the district court said, Wesley, Jr.'s "pretrial statements that petitioner was 'obviously drunk' and smelled of alcohol versus his trial testimony that petitioner did not appear impaired in any way and did not smell of alcohol . . . *appear* inconsistent." *Id*. at 827. Wesley, Jr.'s pretrial statement was that McHone knew what he was doing throughout the commission of the murders — i.e., he was *not impaired* — and is thus fully consistent with his trial testimony to that effect. In his pretrial statement, Wesley, Jr. described McHone's fight with Wesley, Sr., noting that "Steve had the revolver in his hand and was trying to shoot Wesley, Sr.," that "Wesley, Sr. and Steve were swapping punches the entire time," that after Wesley, Sr. thought he had knocked out McHone that McHone acquired a shotgun and "pointed it directly at . . . his father" and "pulled the trigger," and that afterwards Wesley, Jr. and McHone "struggled over the gun." *Id*. at 618-19. In summarizing McHone's physical and mental presence during these events Wesley, Jr. told Officer Perry that "Steve was *not stuttering and appeared to know what he was doing the entire time. He was able to fight both him (Wes) and his father and was able to put up a "pretty good" fight. Steve was not remorseful at all after the shooting was over*." *Id*. at 619. Thus, Wesley, Jr.'s statements to the SBI and his trial testimony are *consistent* on the issue of impairment, which is the only issue that bears directly on the guilt-phase question of McHone's ability to form specific intent and on the sentencing-phase question of the applicability of the impairment mitigator.

The district court noted apparent inconsistencies between Wesley, Jr.'s trial testimony and his pretrial statements regarding his observations of the indicia of McHone's consumption of alcohol. Any inconsistency, however, is limited in scope and does not bear directly on

the question of McHone's ability to form specific intent or the applicability of the impairment mitigator. As noted above, in his pretrial statement Wesley, Jr. described overhearing McHone's argument *with his mother* and concluded that McHone was "obviously drunk." At trial, describing an argument between *McHone and Wesley, Sr.* and in response to the question "[d]uring *this* argument did you know that he [McHone] had been drinking?", Wesley Jr. testified that "[t]he only indication I had, *the only mention of drinking at all during the argument* was the fact that my father told him to go to bed and sleep it off." *Id.* at 290. Thus, Wesley, Jr.'s testimony regarding the evidence of drinking during McHone's argument with his stepfather is unrelated to, and not inconsistent with, his pretrial observations regarding McHone's earlier argument with his mother which apparently was not the subject of his trial testimony. Moreover, consistent with his trial testimony, Wesley, Jr. told Officer Perry that "Wesley, Sr. told Steve to go . . . sleep it off." *Id.* at 617. Similarly, the only evidence Wesley Jr. described in his pretrial statement in support of his observation that McHone was obviously drunk during the argument with his mother was that she "told Steve to go downstairs and sleep it off." *Id.* Accordingly, Wesley Jr.'s pretrial statement and trial testimony are largely consistent, and certainly consistent in material respects, the only inconsistency limited to Wesley, Jr.'s observation to Officer Perry that "he smelled a strong odor of alcohol on Steve" and his trial testimony to the contrary.[1] We are unwilling to find, based on this single, immaterial inconsistency, that the undisclosed evidence is "favorable" under *Brady*. Nonetheless, we will *assume*

---

[1]While Judge Gregory, in dissent, claims that the inconsistencies in Wesley, Jr.'s pretrial and trial statements extends further, he merely states such as a conclusion, without any supporting analysis. He maintains that the inconsistencies extend to Wesley, Jr.'s pretrial statement that McHone was "obviously drunk" and to Wesley, Jr.'s trial statement that the only indication he had that McHone had been drinking was that Wesley, Sr. told him to go "sleep it off." But Judge Gregory does not even reference, much less address, the context of these statements, as we have carefully set forth, which demonstrate that these statements are not, in fact, inconsistent. Additionally, without reference to any specific pretrial or trial testimony, Judge Gregory suggests that Wesley, Jr.'s testimony was inconsistent with respect to impairment. But this conclusion is belied by Wesley, Jr.'s unequivocal assessment of McHone's impairment in his pretrial statement.

such. Even on this assumption, however, we conclude that Wesley, Jr.'s pretrial statement is not material.

At best, McHone might have used the inconsistency in Wesley, Jr.'s statements as to the existence of a smell of alcohol to attempt to impeach Wesley, Jr. *See United States* v. *Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule."). But the impeachment value of this inconsistency is low because the defense had ample testimony regarding McHone's consumption of alcohol that it could have used to attempt to impeach Wesley, Jr. Numerous *state* witnesses, including Tammy Sawyers and police officers Inman and Miller, testified that McHone had consumed a substantial amount of alcohol. J.A. 828-829 (district court reaching the same conclusion). Indeed, Tammy Sawyers testified that McHone was "drunk" though understandable and able to walk, *id.* at 399, and that over the course of the day he consumed two cans of beer, "two pitchers of beer," and "over two and a half pints of liquor." *Id.* at 405. And, at sentencing, the jury found the mitigating factor that "[t]he defendant has a history of long-term substance abuse and *on the night of the offense was under the influence of alcohol.*" *Id.* at 579; 583 (emphasis added). Thus, the jury's failure to consider additional, cumulative evidence relating to the *undisputed* fact that McHone had consumed a vast quantity of alcohol does not "put the whole case in such a different light as to undermine our confidence in the verdict." *Kyles*, 514 U.S. at 434; *United States* v. *Ellis*, 121 F.3d 908, 918 (4th Cir. 1997) ("[P]ost-*Kyles* we do not ignore other evidence presented at trial in determining confidence in the outcome. Instead, we evaluate the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial.").[2]

---

[2]Contrary to McHone's contention, *Monroe* v. *Angelone*, 323 F.3d 286 (4th Cir. 2003), does not aid his materiality claim. There, we found a *Brady* violation where the prosecution failed to disclose that the *only* witness that testified that the murder was premeditated had received numerous incentives from the state — including dismissal of certain gun charges and a reduced sentence for another offense — and had made inconsistent statements to investigators. *Id.* at 314. Moreover, the prosecutor told the jury that "it's absolutely true that the Commonwealth has not promised [the witness] anything." Wesley, Jr. received nothing from the state, his statements and testimony on the determinative issue of impairment were consistent, and this testimony was corroborated by the testimony of Wendy Adams, Tammy Sawyers, and Deputy Inman.

Turning next to the allegedly inconsistent statements of Wendy Adams, Adams said the following in an interview with Detective Terry Miller:

> Adams: [McHone said] 'I can't go on living like this,' that may have been part of the argument that was going on in the kitchen. . . . But I remember him saying that that night, . . . *but he didn't even sound, he did not sound incoherent, or anything else, he just sounded mad.* J.A. 607;

> Miller: *You all mentioned earlier about him being drunk or drugged or both,*[3] *but Wendy mentioned also that he was very coherent*, that was my observation when I got there . . .

> Adams [Wendy]: Well, a lot of people, well, personally, I don't know a lot of people that would cuss and scream like that if they weren't drunk . . . I know a lot of people get real belligerent when they get drunk and always, when I had been around Steve before, he was real smooth when he was clean. *Id.* at 608.

Wendy Adams testified at McHone's trial as follows:

> Q.  Did he stagger, stumble, have any trouble negotiating around the tables or whatever was in the house? A. No . . . Q. Did you notice anything about his speech, that is being mumbled, mush-mouthed, or slurred in any way? A. No. It was slightly louder than normal. *Id.* at 122-23;

> \* \* \*

> Q.  Based on what Randy told Mr. and Mrs. Adams, did they talk with Steven in your presence about alcohol or

---

[3]Wendy and Wesley, Jr. mentioned McHone "being drunk or drugged" *not* based on their personal observations but rather based on Randy Adams' description of a phone call he had with McHone earlier in the evening. J.A. 603.

about being drunk, coming home drunk? A. I didn't pick up on any of that. *Id.* at 159.

As even a cursory comparison of the pretrial and trial statements makes clear, Wendy Adams' undisclosed statement cannot form the basis of a *Brady* violation because it is consistent with her trial testimony and is therefore not "favorable" to McHone. And, even if the undisclosed statement could somehow be used to impeach Wendy, it would not be material because at best it would be cumulative to the undisputed fact that McHone had consumed alcohol.

The SBI files also reveal that Wendy talked to Randy Adams, who had a telephone conversation with McHone on the evening of June 2, and that Randy told Wendy that McHone was intoxicated or impaired. *Id.* at 603. This evidence is not favorable to McHone. As the trial court held, Randy's conversation with Wendy is inadmissible hearsay, *id.* at 159, and Randy's statements about McHone's earlier impairment — based merely on a telephone call — do not bear in any way on Wendy's later observation of McHone. Because this undisclosed evidence is not inconsistent with Wendy's trial testimony, it is not "favorable" under *Brady*.

In addition, petitioner contends that Wendy's description at trial of the fight between Wesley, Sr. and McHone differs from her statement to police. At trial, Wendy testified that she heard a "scuffle" and a "struggle" and that "blows were exchanged." *Id.* at 132-33. In her statement to police, Wendy said:

> It sounded like he was dragging him up the basement steps, beating on him, I'm not sure, and then he, I thought he . . . like, drug him, my impression was that he was beating Steve and had drug him into their bedroom and hit him again maybe, and thought he had knocked him out, and then left the room, maybe, I don't know.

*Id.* at 605. This latter statement is not "favorable" because it is not inconsistent with Wendy's trial testimony, in which she described Wesley, Sr. beating McHone on several occasions during the course of the "struggle" and also described hearing "hitting and dragging" coming from the basement steps. *Id.* at 132-137. And, the jury heard

testimony from Wesley, Jr. that Wesley Sr. was very strong and that at one point it looked as though he had subdued McHone. *Id.* at 262-63.

Randy Adams told police that McHone called him at Mildred and Wesley, Sr.'s house on the night of the murders and asked him if he (McHone) could bring a girl home with him. Randy told him no and McHone, according to Adams, "got real upset with him over this and told [him] that he would kill him." *Id.* at 622. Additionally, Randy told police that Mildred informed him that, based on her observations, McHone was "drunk or doped up," *id.*, and a prosecution witness list notation indicated that Randy might testify that Mildred told him that McHone was "the worst [she had] ever seen him." *Id.* at 660. Randy did not testify at trial, was not at the house when the murders were committed, and did not observe McHone on the evening of the murders. *Id.* at 622.

McHone would not have benefitted from Randy's testimony and thus it does not support his *Brady* claim. As the district court observed, Randy's statement was not favorable because it "contains the fact that McHone threatened to kill Randy over a minor matter shortly before he committed two murders." *Id.* at 840. Moreover, Randy's testimony about Mildred's revelations regarding McHone's condition would have added little to the cumulative evidence presented regarding McHone's intoxication. Lastly, as the district court concluded, the notation on the prosecutor's witness list is scribbled and ambiguous. It could relate to McHone's emotional state, his impairment, or his meanness. *Id.*

McHone next claims that Tammy Sawyers' statement to investigators, in which she described her conversations with McHone on the night of the murder, is *Brady* material. But McHone participated in these conversations and, accordingly, this evidence cannot form the basis of a *Brady* claim. *See Hoke* v. *Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996)("[W]here the exculpatory information is . . . available to the defendant" or "lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine.").

Similarly, under *Hoke*, McHone's telephone call to his Alcoholics Anonymous sponsor, Mark Tuttle, approximately thirty minutes

before the shootings, cannot form the basis of a *Brady* claim. *Id*. This evidence would not constitute *Brady* material in any event. In this conversation, McHone is described by the SBI as "sound[ing] upset and [as] crying" and as "not seem[ing] to be making much sense," J.A. 611. But during the conversation McHone also said that he thought "someone was going to die that night." *Id*. We agree with the district court that the *unfavorable* portion of the SBI's report of this telephone conversation would have outweighed any exculpatory value because it "shows clearly that, just prior to the murders, petitioner was contemplating killing someone and sought help because he was aware it was wrong[, and that] [w]hen he did not receive the help he sought, he simply acted on the thoughts." *Id*. at 838. This "would have been fatal to his claim that he was so impaired that he could not form an intent to kill." *Id*.

Nor does Deputy Inman's statement to the SBI support McHone's *Brady* claim. Inman told the SBI that McHone had a "strong odor of alcohol" and that he did not appear to be "steady on his feet." *Id*. at 602. At trial, Inman testified that McHone walked *well enough*, talked *well enough*, and was aware enough for him to form the overall opinion that he was not impaired. *Id*. at 179-180. Inman's trial testimony that McHone "walked well enough" is not inconsistent with the portion of the SBI report referenced by petitioner, in which Inman noted that McHone smelled of alcohol and appeared unsteady. The portion of the SBI report not referenced by petitioner, in which Inman reported that McHone's speech was not slurred and that he appeared to "know what was going on around him," *id*. at 602, confirms that the two statements are indeed consistent and that they cannot form the basis of a *Brady* claim.

Last, McHone identifies as *Brady* material the statement of William Kent Hall, a medical first responder to the scene of his crime, which includes Hall's observation that McHone was "screaming and kicking the glass in the patrol car." *Id*. at 675. But this statement is not favorable; it bears neither on impairment nor (helpfully to McHone) on petitioner's state of mind at the time of the crime.

B.

Petitioner contends that the cumulative effect of the non-disclosed evidence would have "further undermined an already marginal first degree murder conviction," *Petitioner's Br.* at 28, because the trial was closely contested both as to premeditation and as to whether McHone's intoxication prevented him from forming specific intent to kill. *Id.*[4] Petitioner also contends that the non-disclosed evidence would have been cumulatively material at sentencing because it might have caused the jury to find the mitigating circumstance under N.C. Gen. Stat. § 15A-2000f(6) ("the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired").

Petitioner may benefit from the "cumulativeness" of evidence that is "favorable" under *Brady*. Here, however, only Wesley Jr.'s statement is even arguably favorable and, as discussed above, not even it is material. Moreover, as the district court concluded, even if all of the undisclosed evidence were favorable, it would not undermine confidence in the result of guilt or sentencing. J.A. 845. The jury heard testimony from *state* witnesses that McHone had consumed large quantities of alcohol and was "drunk," from defense witnesses that McHone's drunkenness caused him to be impaired, and from experts

---

[4]Petitioner and Judge Gregory's characterization of McHone's first degree murder conviction as "marginal" or "weak" is fanciful. The jury was presented ample evidence from which it could conclude that McHone committed the murders with the requisite malice, premeditation, and deliberation. The jury heard evidence that on prior occasions McHone had chased his mother around the house with a knife, threatening to kill her, *McHone*, 435 S.E.2d at 301, that Mildred reported to her friends that she was afraid to be alone with him because "[h]e ha[d] told [her] that he [was] going to kill [her]," *id.*, and that she was "afraid to lay down and go to sleep at night" because she believed that "sooner or later he [was] going to kill [her]." *Id.* The state also proffered testimony that McHone loaded both murder weapons just prior to using them to kill his victims and that he was able to reload the shotgun after he killed Wesley, Sr. J.A. 461. And, of course, Wesley, Jr. testified that after he was subdued by Wesley, Sr., McHone acquired the shotgun, walked from the back room to the kitchen, and shot his step-father in the chest, killing him.

that McHone had a substance abuse problem. The jury's verdict and determination at sentencing reflects their belief that while McHone was "under the influence of alcohol" when he committed the crime, *id*. at 579, 583, he was *not impaired*, and the trial testimony of Wesley, Jr., Wendy, and Inman pertaining to *impairment* is entirely consistent with their pretrial statements.

Petitioner contends that the undisclosed evidence is cumulatively material because, after reviewing this evidence, Dr. Groce, a sentencing-phase defense witness who admitted on cross examination that McHone "would have been able to form specific intent to commit the alleged crimes" (notably a guilt phase question), *id*. at 494-94, stated in a post-conviction affidavit — on the basis of the undisclosed evidence — that "I no longer have the opinion that Mr. McHone could form the specific intent to kill." *Id*. at 688. Dr. Groce did not aver in his post-conviction affidavit that he held the opinion that McHone could not have formed the specific intent to kill; he said only that he no longer had the opinion (to which he had previously testified) that McHone could form such an intent. We do not believe that the district court erred, in refusing to accord Dr. Groce's conclusory affidavit any weight on the grounds that "Dr. Groce's affidavit is far too conclusory . . . . He does not explain what materials he reviewed or what in the materials caused him to alter his opinions," *see id*. at 847.

In sum, the North Carolina Supreme Court's conclusion that McHone did not present a tenable *Brady* claim was not an "objectively unreasonable" application of federal law. *Bell*, 236 F.3 at 158.

### III.

In order to establish a claim for ineffective assistance of counsel, McHone must show, first, that his trial counsel's performance was deficient and, second, that the deficiency prejudiced McHone's defense. *Strickland* v. *Washington*, 466 U.S. 668, 687 (1984). Under *Strickland*'s "performance" prong, McHone must demonstrate that trial counsel's performance fell below an objective standard of reasonableness as determined by comparison to "prevailing professional norms." *Id*. at 688. In addition, McHone must also show under *Strickland*'s prejudice prong that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. If McHone fails to demonstrate sufficient prejudice from certain acts or omissions, we need not decide whether counsel's performance in those respects was, in fact, deficient under *Strickland*. *See id.*

McHone claims that his trial counsel provided ineffective assistance because they (1) failed to investigate and present evidence of lack of specific intent, (2) failed to object to a portion of the prosecutor's closing argument that incorrectly stated the law of voluntary intoxication, and (3) failed to uncover certain mitigating evidence from McHone's childhood. The Surry Count Superior court, the North Carolina Supreme Court, and the district court rejected these claims on the merits.[5] For the reasons that follow, we see no reason to disturb these judgments.

## A.

McHone's first claim arises from the fact that counsel did not inter-

---

[5]In an effort to dilute the deference to which the state court is entitled under AEDPA, 28 U.S.C. § 2254(d), petitioner points to the "State court's one-line adjudication" of his *Strickland* claims. *Petitioner's Br.* at 16, 37. Under our circuit precedent, such an adjudication does not defeat the deference to which the state court's judgment is entitled. *See Bell*, 236 F.3d at 158 (summary adjudications subject to full AEDPA deference). Moreover, while petitioner's characterization of the North Carolina Supreme Court's treatment of this matter is accurate, it ignores the extensive treatment that some of petitioner's *Strickland* claims received in the Superior Court. J.A. 731-774. While the North Carolina Supreme Court reversed and remanded the Superior Court order containing these rulings, *id.* at 780, it did so only so that the Superior Court could determine "whether defendant or defendant's counsel was served with a copy of the original proposed order" and for reconsideration of a discovery motion. *Id.* We conclude that the North Carolina Supreme Court's subsequent denial of McHone's petition for post-conviction relief on all claims otherwise left intact the reasoning of the Superior Court, *id.* at 815, and that the state is accordingly entitled to the benefit of the more thorough treatment of petitioner's *Strickland* claims in that court. *See Bell*, 236 F.3d at 159 ("a detailed state court order is more likely to withstand federal judicial scrutiny.").

view McHone's alcoholics anonymous sponsor, Mark Tuttle; two jailors who observed McHone after the murders, Leroy Snow and Charles Collins; McHone's former substance abuse counselor, George Delp; McHone's probation officer, Larry Cheney; and did not proffer expert testimony as to McHone's blood alcohol content as it related to his ability to form the specific intent to kill.

Defense counsels' failure to interview and present Mark Tuttle as a witness cannot form the basis of a *Strickland* claim because it was not prejudicial. Indeed, as discussed above, Tuttle would have testified that McHone contemplated murder just hours before he killed his parents. J.A. 611, 838. Any benefit McHone might have received from Tuttle's general statements that McHone was "upset" and did not seem to be "making much sense" — statements which are notably cumulative with the testimony of McMillian and Bryant if not the testimony of the state's witnesses — would surely have been offset by McHone's prediction to Tuttle that "somebody was gonna die that night." *Id.* at 611. That Tuttle's testimony would have added little to help McHone is confirmed by the jury's decision to recommend the death penalty notwithstanding its conclusion that McHone committed the murders "while he was under the influence of mental or emotional disturbance," *i.e.* upset. *Id.* at 579; 583.

Similarly, counsels' failure to interview Leroy Snow and Charles Collins, two of McHone's jailors, cannot form the basis of a *Strickland* claim. Snow, who observed McHone after he arrived at the Surry County jail, said that "it appeared . . . that Steven had taken some kind of drugs or had consumed a lot of alcohol," *id.* at 681, while Collins, who was on duty with Snow, said that "Steven . . . appeared . . . high on dope or a combination of drugs and alcohol," that he "smelled very strongly of alcohol," and that "his speech was slurred." *Id.* at 689. As we concluded with respect to his *Brady* claim, McHone was not prejudiced by the absence of additional testimony pertaining to his consumption of alcohol and his level of impairment. The jury heard testimony from *state* witnesses that McHone had consumed large quantities of alcohol and was "drunk," from defense witnesses that McHone's drunkenness caused him to be impaired, and from experts that McHone had a substance abuse problem. And, the witnesses that testified at trial observed McHone in the time leading up to and during the murders, during which time, the jury concluded, McHone

formed the requisite intent for first degree murder, while Snow and Collins did not observe McHone until several hours later.

McHone alleges further ineffectiveness in his counsels' failure to interview George Delp, a Surry County substance abuse and mental health counselor who counseled McHone from November 1989 until March 1990. In his post-conviction affidavit, Delp stated that McHone had reported a history of severe substance abuse, that he stayed sober while in counseling (which he evidently discontinued several months before the murders), that he never expressed animosity toward his parents, that he expressed remorse for his crimes, and that he would not "have committed this crime had he not been severely impaired by intoxication." J.A. 679-680. The district court concluded that McHone was not prejudiced by the absence of such testimony, reasoning as follows:

> Delp's testimony regarding petitioner's participation in the counseling program is barely relevant. Delp shows that while petitioner could stay sober and do well for extended period of time, he did not do so prior to the murders. This is hardly a redeeming character trait. Delp's opinion that petitioner would not have committed the murders unless intoxicated is simply his unsubstantiated personal opinion and would not be admissible. . . . Delp's testimony concerning petitioner's self-serving statements in prison following the murder are of little help to petitioner. Similar testimony was presented, along with evidence that the statements were fabricated by petitioner to escape the death penalty. The jury did not believe petitioner's other self-serving statements and one more would not have altered the situation.

*Id.* at 863-64. We agree with this reasoning and the district court's conclusion that McHone was not prejudiced by Delp's absence, particularly where, as here, the jury concluded that McHone had "previously sought help for his substance abuse problems," *id.* at 580, 584, but nonetheless recommended the death penalty.

McHone was not prejudiced by counsel's failure to present the testimony of his probation officer Larry Cheney. Cheney could have testified that McHone called on the day of the murders and successfully

sought permission to stay out late, that McHone was a timid, humble individual, that he struggled with substance abuse, and that he did not complain about the terms of his probation. *Id.* at 571, 673. At trial, the defense succeeded in excluding evidence of McHone's probationary status, *id.* at 245-49, and therefore Cheney's testimony, and thus any prejudice, would relate only to sentencing. But the jury found that McHone had a history of substance abuse and was drinking the night of the murders, *id.* at 579, 583, and McHone' purported humility and his unsuccessful attempt to obey the conditions of his probation did not relate to any of the mitigating factors considered and rejected by the jury.

Nor can McHone find relief in counsels' failure to garner expert testimony regarding his blood alcohol content. Dr. Warren, who testified for the defense, said, post-conviction, that if counsel had provided him with the testimony of Sawyers, Bryant, and McMillian, he could have calculated McHone's blood alcohol content and testified that McHone was "incapable of forming specific intent to kill." *Id.* at 677. But Dr. Warren did not need counsel's help to calculate McHone's blood alcohol content; rather, as explained by the district court, Dr. Warren could have used his interviews with McHone or Dr. Groce's report, "where McHone set out the amounts of alcohol he consumed," to perform this calculation. *Id.* at 848-49. Accordingly, any ineffectiveness is attributable to McHone's expert rather than to his counsel and therefore cannot support a *Strickland* claim. *See Thomas* v. *Taylor*, 170 F.3d 466 (4th Cir. 1999) (rejecting petitioner's efforts to recast a claim concerning the effectiveness of an expert as a *Strickland* claim). And, even if counsel were to blame, petitioner was not prejudiced, because the jury unanimously rejected Warren's sentencing testimony that McHone was entitled to the statutory mitigator, N.C. Gen. Stat. § 15A-2000f(6) ("the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired"), even though Tammy Sawyers, the state's witness, had testified that McHone had consumed vast quantities of alcohol and even though the jury concluded that McHone committed both murders "under the influence of alcohol." J.A. 579, 583. As the state court concluded, counsels' failure to put forth additional evidence quantifying McHone's drinking does not satisfy either *Strickland* prong. *Id.* at 743.

B.

McHone alleges further ineffectiveness in his counsels' failure to object to a portion of the state's closing argument pertaining to the burden of proof for McHone's voluntary intoxication defense. In his closing argument, purporting to quote the law as interpreted by the North Carolina Supreme Court, the prosecutor stated:

> One of the things I want to talk with you about is the defense of intoxication . . . [i]f we're going to apply that defense to the facts in this case then we really need to, ought to know what it's about . . . [i]n *State* v. *Bunn*, [the] North Carolina Supreme Court, in the spring term of 1973, said 'the defense to charge of murder is that he was so drunk that he was utterly incapable of forming a deliberate and premeditated purpose to kill' . . . This is what the court said about that.

J.A. 442.

* * *

> Voluntary drunkenness is not a legal excuse[.] . . . Evidence must show at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him . . . utterly incapable of forming a deliberate and premeditated purpose to kill . . . This is what the North Carolina Supreme Court has said about that defense.

*Id*. at 447-48. This statement is not correct. Rather than reciting the proper considerations for the *jury* vis-a-vis McHone's voluntary intoxication defense, the prosecutor recited the standard the *court* must apply in order to determine whether the defendant is entitled to an instruction on voluntary intoxication. *State* v. *Mash*, 372 S.E.2d 532 (N.C. 1988). And, indeed, in *Mash*, where the trial court included very similar language in its *jury instructions*, the North Carolina Supreme Court awarded the defendant a new trial because it concluded that "to find for the defendant on the intoxication issue, the jury does not have to conclude that his intoxication rendered him

utterly incapable of forming the necessary intent; it need only conclude that because of his intoxication either defendant did not form the requisite intent or there is at least a reasonable doubt about it." *Id.* at 537. *Mash* also noted that language similar to that used by the prosecutor in this case "could have led a rational jury to believe that defendant bore the burden of persuading the jury that he was so intoxicated as to be unable to form a deliberate and premeditated intent to kill." *Id.*

We do not reach the question of whether counsel's failure to object to the prosecutor's statements was objectively unreasonable because we are satisfied that McHone cannot establish prejudice from the prosecutor's closing statement. Unlike in *Mash*, here, the trial court *properly instructed* the jury on the defense of voluntary intoxication. Notwithstanding the prosecutor's incorrect statement of the law in his closing statement, the trial court correctly instructed the jury as follows:

> Now, members of the jury, as to the defense of voluntary intoxication, I instruct you that if you find there is evidence which tends to show that the defendant was intoxicated from alcohol or other impairing substance at the time of the acts alleged in this case then you should consider the following instructions: Generally voluntary intoxication from such a substance is not a legal excuse for crime. However, if you find that the defendant was intoxicated from alcohol or other impairing substance you should consider whether this condition affected his ability to formulate the specific intent which is required for a conviction of first degree murder; or for that matter, assault with a deadly weapon with intent to kill. In order for you to find the defendant guilty of first degree murder by premeditation and deliberation you must find beyond a reasonable doubt that he killed with malice, and in the execution of actual specific intent to kill formed after premeditation and deliberation. *If as a result of intoxication from alcohol or other impairing substance the defendant did not have a specific intent to kill the deceased in either of the three cases, or if you find he did not have the specific intent to kill in either of the two murder cases*

*formed after premeditation and deliberation he would not be
guilty of such offense.*

Supp. J.A. 66-67 (emphasis added). Further, the court instructed that
it was the jury's "duty to apply to the facts the law which I am about
to give you," *id.* at 43, and that "I would expect only that you apply
the law which I have given you to the facts as you find them." *Id.* at
68.

It is fundamental in the law that "[a] jury is presumed . . . to follow
its instruction," *Weeks* v. *Angelone*, 528 U.S. 225, 234 (2000). Here,
not only did the trial court instruct the jury correctly as to the govern-
ing law; it instructed the jury both clearly and in detail. Indeed, not
only did the trial court correctly, clearly and in detail instruct the
jury as to the governing law; additionally, the court instructed the jury
that it was only to apply the law as to which the court had instructed,
eliminating any doubt (if there were any) that statements by the prose-
cutor or defense as to the law were not to be considered. Moreover,
the trial court's clear, particularized, correct instruction followed
almost immediately upon the prosecutor's closing statement, only a
brief recess separating the argument from the instruction.

In light of the controlling presumption that the Supreme Court has
directed us to indulge, and the context of the prosecutor's statement
and the curative instruction described, we cannot possibly conclude
that the North Carolina Supreme Court unreasonably applied federal
law in concluding that McHone was not prejudiced by counsel's fail-
ure to object to the prosecution's misstatement. *See* J.A. 753-56
("Defendant has failed to show the existence of either the prejudice
or performance component of . . . *Strickland*."). In light of this pre-
sumption and context, we could not conclude that the state court
erred, even were the state court's judgment not subject to the deferen-
tial standards of AEDPA to which it undeniably is subject. *See*, *e.g.*,
*United States* v. *Catlett*, 97 F.3d 565, 573 (D.C. Cir. 1996) (holding
that accurate jury instructions on the state's burden of proof "would
have cured any confusion caused by the prosecutor's remarks" sug-
gesting incorrectly that the burden rested with the defendant); *see also*
*Boyd* v. *French*, 147 F.3d 319, 329 (4th Cir. 1998) (holding that a
prosecutor's repeated improper references to his personal opinions on
the defendant's credibility and the weight to be given various mitigat-

ing factors did not deny the defendant due process where "the state trial judge instructed the jurors that they were to decide the facts based on the evidence presented").

## C.

Relying on the affidavit of a social worker and *Wiggins* v. *Smith*, 123 S. Ct. 2527 (2003), McHone claims that his counsel was ineffective for failing to investigate and present mitigating evidence of his chaotic and violent childhood. But unlike in *Wiggins*, where counsel made "a tactical judgment not to present mitigating evidence at sentencing," *id.* at 2535, and the Court determined that "the investigation supporting counsel's decision not to introduce mitigating evidence" was insufficient, *id.* at 2536, McHone's counsel presented substantial evidence of the hardships McHone endured as a child and the jury found seven mitigators for each murder charge on the basis of this testimony. J.A. 579-80, 584-85.

Accordingly, we analyze whether the scope of counsel's investigation in support of the mitigation case presented at sentencing was objectively reasonable. Counsel presented its mitigation case through the testimony of McHone's father and Dr. Warren. Counsel retained Dr. Warren, a forensic psychologist, to, *inter alia*, consider "sentencing factors" and "recommendations for sentencing or things of that nature." *Id.* at 509-10. In support of his evaluation, Dr. Warren relied on McHone's medical records, school records, psychiatric records, reports from Dr. Rollins and Dr. Groce, and several interviews with McHone. *Id.* at 510-512. Based upon the information included in these sources, Dr. Warren testified that McHone had "a very serious substance abuse problem since a very early age," *id.* 513, "was exposed to . . . alcohol abuse and alcoholism" by his "father at [an] early age," *id.* at 514, and that after his mother's marriage to Wesley, Sr., he was the "odd man out." *Id.* at 515.

McHone's father, Bobby, testified that early in McHone's life, while Bobby was married to Mildred, Bobby was continually "drunk," "did everything wrong," and "gave Mildred no peace whatsoever," and that McHone witnessed his parents arguing. *Id.* at 532-33. Bobby further testified that this state of affairs continued until, after an extremely violent fight with Mildred, he hospitalized himself

and subsequently managed to quit drinking for five years, until the time of his separation from Mildred. McHone was ten years old at the time. *Id*. at 532-34. After Mildred and Bobby separated, they agreed that she would keep McHone one year and Bobby the next (and so forth), and Bobby testified that, during the time he kept McHone, he provided no supervision, he was drinking and gambling, he took McHone to bars with him where they sometimes spent the night, that McHone started drinking when he was 13, started doing drugs when he was 15, and that McHone's alcohol and substance abuse worsened over time. *Id*. at 538-541.

Based on this testimony, the jury found the following mitigating factors for both murders: "the defendant had a history of long-term substance abuse," "the defendant enjoyed a normal childhood until the time his parents separated, and after that, he began using alcohol and drugs," "[d]efendant's father abused alcohol and gambled excessively and defendant, when he was a child, often spent time with his father in bars while his father drank and gambled," "[d]efendant often witnessed arguments between his father and mother," "[d]efendant, while he resided with his father, was often left alone at night, without supervision, while his father worked third shift," and "[d]efendant, while he resided with his father, often had to reside in undesirable places." *Id*. at 579-80, 583-84.

Despite this comprehensive presentation of mitigating evidence supported by direct witness testimony and the thorough investigative efforts of Dr. Warren, McHone claims his counsel was ineffective because their investigation failed to uncover information contained in the post-conviction affidavit of Dr. Glenn E. Rohrer. J.A. 576. McHone claims that counsel would have uncovered the information in this affidavit if they had retained a mitigation expert or conducted a more thorough investigation.

This claim is meritless. Dr. Rohrer's affidavit is almost entirely cumulative with the testimony that McHone's counsel presented at trial. *See*, *e.g.*, J.A. 576 (Rohrer averring that "Bobby McHone was drunk and abusive," that "family problems and dysfunction permeated Steven's social history," that "he began medicating with drugs and alcohol when he was approximately 12 years old," that "Bobby McHone exposed Steve to . . . heavy drinking, marijuana use and

gambling," that "Steven was the odd person out amongst his half-siblings," and that "the custody arrangement . . . was emotionally unstable").

And, the portions of Dr. Rohrer's affidavit that purportedly differ from the trial testimony, namely that McHone witnessed Bobby "regularly inflict brutal beatings on Mr. McHone's mother and his sister," *id*. at 575, and that Bobby "made repeated sexual advances towards Steven's half-sister," *id*. at 576, are not sufficient to establish either that counsels' decision not to investigate further was objectively unreasonable or that McHone was prejudiced by that decision. Indeed, Bobby testified that he had violent fights with Mildred and that McHone, though young, witnessed these arguments. Moreover, Dr. Rohrer's affidavit does not conflict with the time-line established during Bobby's testimony, namely that the bulk of the drinking and violence during their marriage occurred before McHone was five years old and that, after McHone was five, Bobby stopped drinking and gambling. Finally, Dr. Rohrer has provided no indication that McHone was aware of his father's sexual advances toward his half sister. Accordingly, we hold that where, as here, counsel has investigated and presented mitigating evidence pertaining to petitioner's childhood and that the jury has credited such evidence and nonetheless imposed the death penalty, that counsel's decision not to investigate further, particularly where such investigation would bear little — if any — fruit, cannot support a *Strickland* claim. The state court's identical conclusion, J.A. 752-52, was therefore not objectively unreasonable.

### IV.

Judge Gregory, in dissent, concludes the McHone is entitled to relief under *Strickland* because of counsel's failure to investigate and present evidence of specific intent, because of counsel's failure to object to the prosecutor's improper closing argument, and because of counsel's failure to adequately investigate mitigating evidence. But he provides little, if any, analysis as to why the North Carolina Supreme Court's adjudication of these claims constituted an "objectively unreasonable" application of federal law. Indeed, Judge Gregory's analysis on these scores comprises only conclusory statements that "[i]n light of the gravity of these errors and their prejudicial effect,

AEDPA's 'unreasonable application' standard does not alter" his conclusion that counsel acted unreasonably, *post* at 54, and that the state court's determination that McHone was not prejudiced by counsels' purported errors was objectively unreasonable "given the gravity of these errors and their prejudicial effect." *Post* at 63. Such conclusory statements and cursory treatment are an insufficient basis to reverse a judgment entitled by statute to substantial deference by the federal courts.

Judge Gregory maintains that counsel erred by not procuring testimony regarding McHone's blood alcohol content on the night of the murder. But he concedes, as he must, that circuit precedent dictates that McHone is not entitled to relief for ineffectiveness attributable to his expert, even if it could be said that McHone's expert was ineffective, which he clearly was not. *Post* at 49-50. While Judge Gregory claims that this authority is inapplicable because "counsel failed to give [Dr. Warren] all the necessary information" to calculate petitioner's blood alcohol content, *post* at 49, such a conclusion ignores the district court's finding that "*Dr. Warren testified*" that he reviewed Dr. Groce's report where Dr. Groce "*set out the amounts of alcohol* [McHone] consumed." J.A. 848. Indeed, the dissent makes no attempt whatsoever to reconcile Dr. Warren's trial testimony with his claim in his post-conviction affidavit that he "received no specific information regarding the amount and types of alcohol ingested by McHone," a claim that is belied by the contents of Dr. Groce's report. Such merely serves to highlight that the state court's conclusion that Dr. Warren's failure to testify to McHone's blood alcohol content was indeed an entirely reasonable application of *Strickland*.

In the same vein, Judge Gregory concludes that counsel performed unconstitutionally by failing to interview and present as witnesses Mark Tuttle and McHone's jailors, Leroy Snow and Charles Collins. Judge Gregory suggests that Tuttle could have offered "key testimony on McHone's state of mind," *post* at 51, that "McHone was not threatening his parents that night," *post* at 56, and could have testified as to McHone's "impairment." *Post* at 70. But Tuttle could not have testified to McHone's impairment because he did not *observe* McHone on the night of the murders. Moreover, testimony that McHone was "upset and crying" is plainly cumulative with the testimony of virtually every witness that did observe McHone on the night of the mur-

ders and does not bear on whether McHone formed specific intent in any event. And any benefit McHone might have received from Tuttle's testimony that McHone was "upset" and "asked him to come over there and see him," J.A. 611, would obviously have been offset by McHone's revelation to Tuttle that "somebody was gonna die that night" and Tuttle's observation that McHone had been "backsliding" from his efforts to reduce his drug and alcohol dependency — testimony that no counsel would want placed before the jury. *Id.* at 610-11.

Judge Gregory also suggests that if Collins and Snow had testified that their testimony would have been "in *direct contradiction* to the testimony of the State's law enforcement witnesses." *Post* at 51. But such a conclusion mischaracterizes the possible content of the jailor's testimony; they could not *directly contradict* the testimony of the other witnesses because they did not observe McHone until two hours after the commission of the murders. Moreover, Judge Gregory's conclusion is inconsistent with his determination that McHone's *Brady* claim is meritless. While Judge Gregory writes separately to explain that Randy Adams' statement, where he purportedly revealed that McHone was drunk and "the worse I've ever seen him," *post* at 45, and Deputy Inman's statement, that McHone had a strong odor of alcohol and was not steady on his feet, were favorable under *Brady*, he nonetheless concluded that the suppression of these statements was not material. Inman's and Adams' statements being, in material respects, indistinguishable from Snow's and Collins' statements, Judge Gregory's conclusion that the absence of the former was not material under *Brady* while at the same time concluding that the absence of the latter was prejudicial under *Strickland* is analytically indefensible.

Similarly, Judge Gregory concludes that counsels' failure to object to the prosecutors' statements regarding McHone's voluntary intoxication defense warrants relief under *Strickland* because the jury might have been "confused on the correct standard." *Post* at 59. But Judge Gregory *concedes* that "the judge did give a proper jury instruction," *id.* at 58. Thus, in order to reach the conclusion that he does, Judge Gregory must disregard the Supreme Court's teaching that juries are *presumed* to follow such instructions, particularly where, as here, the trial court instructed the jury that "I would expect *only* that you apply

the law which I have given you to the facts as you find them." J.A. 68. In addition to his necessary disregard of Supreme Court precedent and the particular instructions given to McHone's jury, Judge Gregory's conclusion ignores the standard of review, set forth by Congress, that petitioners such as McHone are entitled to relief only where a state court's application of federal law is objectively unreasonable. Here, the state court presumed, as the Supreme Court has instructed, that the jury followed the trial court's instructions. This is precisely the presumption required of the state court by the Supreme Court of the United States. It is simply insupportable in the face of this indisputable adherence to the Court's precedent by the state court and without *any* analysis or supporting authority whatever, to conclude that the state court unreasonably applied established federal law.

Judge Gregory's conclusion that McHone's counsel was ineffective for failing to present *additional* mitigating evidence relating to McHone's childhood is similarly untenable. As noted above, unlike in *Wiggins* where counsel did not present *any* evidence of mitigation, here counsel submitted ample evidence of the hardships McHone endured during his childhood and the jury credited this evidence when it found the related mitigating factors. Judge Gregory's description of counsels' actions and the purported prejudice therefrom simply fails to confront this fundamental point. Judge Gregory suggests that a mitigation investigation "would have revealed" that "McHone has a history of chronic violence from birth through the divorce of his parents," that "McHone's childhood was marked by deprivation," that "McHone's parents agreed to an unconventional custody arrangement," and that "McHone self-medicated with drugs and alcohol from age 12." *Post* at 54. But McHone's counsel presented this evidence to the jury. Bobby McHone testified that early in McHone's life that Bobby was continually drunk, "gave Mildred no peace whatsoever," that McHone witnessed his parents arguing, and that Mildred and Bobby agreed to an unconventional custody arrangement. J.A. 532-34. Moreover, as described in detail above, both Dr. Warren and Bobby McHone testified that McHone used drugs and alcohol from an early age and suffered various forms of deprivation.

Despite counsels' introduction of this substantial mitigating evidence, Judge Gregory maintains that counsels' mitigation *investigation* was inadequate because the jury might have been confused by the

mitigating factor that McHone "enjoyed a normal childhood until the time his parents separated, and after that, he began using alcohol and drugs." But the phrasing of one mitigating factor does not bear on the propriety of the scope of counsels' mitigation investigation. And, while Judge Gregory suggests that this mitigating factor could have caused the jury to conclude that McHone's childhood difficulties did not begin until his parents' divorce, he does not identify any evidence that rebuts Bobby McHone's testimony that from the time he quit drinking — when McHone was five years old — until the time he separated from Mildred — when McHone was ten years old — that there were "a few arguments" but that it "wasn't like it was when I was drinking." J.A. 534.

## V.

For the reasons stated, the judgment of the district court is affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

The majority denies McHone habeas relief finding that the North Carolina Supreme Court's disposition of his *Brady* and *Strickland*

claims was not contrary to, nor an unreasonable application of, clearly established federal law. I concur with the majority that McHone's *Brady* claim must fail. However, I write separately because I believe that while the withheld evidence was not "material" under *Brady*, it was "favorable."

Respectfully, I must dissent from the majority's analysis and conclusion on McHone's *Strickland* claim. McHone's counsel rendered objectively unreasonable performance by failing to seek expert testimony on McHone's blood alcohol level, interview or present testimony from several witnesses that had either spoken with or observed McHone on the night of the murders, object to the State's improper closing argument, and investigate McHone's childhood for mitigation evidence adequately. These errors prejudiced both the guilt and sentencing phases, and the state court was objectively unreasonable in ruling otherwise.

I.

Because the majority fails to state the facts related to the night of the killings in detail, facts which are essential to analyzing McHone's claims, I fully recount them here. On June 3, 1990, Wesley, Sr. and Mildred returned to their home in Siloam, North Carolina around 12:30 a.m. with Wesley, Jr., McHone's half-brother; Wendy, Wesley, Jr.'s wife; and Alex, Wesley, Jr. and Wendy's two-year old son. Wesley, Jr. and Wendy, both Captains in the United States Air Force, were on leave and visiting Wesley, Sr. and Mildred and the family had gone on a fishing trip. McHone, who lived with Wesley, Sr. and Mildred, and Randy Adams, McHone's half-brother, were there when the family arrived.[1]

Upon arriving, Wesley, Sr. drove Randy home, who lived just down the street. When he returned, McHone, Mildred, and Wesley, Sr. began arguing in the kitchen apparently about money.[2] As the

---

[1]Wesley, Sr. and Mildred were married and had Wesley, Jr., Randy, and another child. They then divorced and Mildred married Bobby McHone, Petitioner's father. Mildred and Bobby, who only had one child —McHone, later divorced and she remarried Wesley, Sr.

[2]Wendy testified at trial that Mildred acted as a bookkeeper for McHone's money and that McHone was paying "reparations" from a pre-

argument got louder, Wendy and Alex went to bed and Wesley, Jr. took a shower. The argument continued until after Wesley, Jr. got out of the shower but shortly thereafter he heard his father, Wesley, Sr. state, "We'll talk about it tomorrow," at which time McHone went down to his bedroom, which was in the basement. J.A. 252. A few minutes later, Mildred came to the bedroom that Wesley, Jr. and Wendy were in and asked if they had moved a gun that was in the camper the family took on the earlier fishing trip. They told her that they had not and she said that the gun was missing.

A few minutes later, three shots were heard from the back yard. Upon hearing the shots, Wesley, Jr. ran into the hallway where he saw Wesley, Sr. coming up from the basement stairs, shouting for him to call 911. Wesley, Jr. went to the phone in the kitchen and called 911 while his father ran out to the backyard.

Shortly thereafter, Wesley, Sr. and McHone came through the back door into the kitchen wrestling with each other over a gun in McHone's hand. Wesley, Jr. intervened and got the gun away from McHone. Wesley, Sr. and McHone continued to wrestle and Wesley, Sr. told Wesley, Jr. that, "Your mother's down. Call 911. Get help out here for her." J.A. 262. Wesley, Jr. went back to the phone and McHone and Wesley, Sr. disappeared down the hallway fighting. Wesley, Sr., apparently believing he had knocked McHone out, then reappeared in the kitchen, breathing heavily, saying again, "Your mother is facedown out back. You have got to get help for her. Your mother's facedown. I don't know how badly she's hurt." *Id.* at 263-64. Then McHone appeared out of the hallway carrying a shotgun and

---

vious conviction. J.A. 152-53. McHone's counsel objected to this latter statement, which the trial judge sustained. Wendy also testified that "[t]he part of the argument that I heard was [McHone] saying that he wanted his money and that he couldn't go on living like that." *Id.* at 159.

Wesley, Jr. testified similarly stating that McHone was arguing with Mildred and Wesley, Sr. about his money and the rules surrounding his probation. *Id.* at 245. The trial judge also excluded this reference to "probation" over the prosecution's argument, made outside the presence of the jury, that they should be allowed to present such testimony as evidence of motive. *Id.* at 246-49.

Wesley, Sr. lunged towards McHone to get it. Before he reached the shotgun, McHone shot Wesley, Sr. who fell into Wesley, Jr., the force of the blow knocking them both down.

As McHone began to bring the shotgun back up, Wesley, Jr. went for it and began to struggle with McHone. They fought for several minutes, but Wesley, Jr. got the shotgun away from McHone, placed it on the floor beside them, and was then able to subdue McHone. Wesley, Jr. testified that McHone then began crying and said, "Oh, my God. What have I done?" but moments later reached for the shotgun on the floor. J.A. 269. They fought again and Wesley, Jr. took the shotgun and held it over McHone, who was laying on the floor. It took Wesley, Jr. approximately ten minutes to subdue McHone.

Wesley, Jr. testified at trial that McHone then began to goad Wesley, Jr. into killing him stating, "I killed him. Now I want you to kill me, because I don't want to spend the rest of my life in jail. Just shoot me. Just get it over with." J.A. 272-73. McHone also began using profanity and stated that this was Wesley, Jr.'s fault because he was Mildred's "golden boy" and that he did not have the guts to kill McHone. *Id.* at 138, 270. Wesley, Jr. testified that McHone said, "if I didn't kill him and he got out of jail he'd hunt me down and hunt my family down and finish us off." *Id.* at 270. Then Wendy, who had been in the bedroom with Alex since the initial shots, called out to see if Wesley, Jr. was alright and before Wesley, Jr. answered, McHone stated, "I killed your mama and your daddy. And I would have killed you and your damn baby too." *Id.* at 272.

Medical personnel and officers from the Surry County Sheriff's Department arrived a little after 2:00 a.m. Wesley, Sr. was dead upon their arrival, and Mildred died later by a wound from a gunshot to the back of her head. McHone was arrested and made statements acknowledging his guilt. During this time, the phone, which Wesley, Jr. had dropped, was still on the line with 911. A 911 tape recorded the sequence of events from after Mildred was shot until the Sheriff's deputies arrived on the scene. The tape, however, is missing.[3]

_____

[3]The magistrate judge's Report and Recommendation ("R&R") noted: "It is not entirely clear what became of the 911 tape. The original was,

At trial, McHone claimed that he was too intoxicated to form the necessary specific intent of premeditation and deliberation for first-degree murder. The testimony disclosed that McHone had spent the afternoon and evening of June 2 with Jimmy McMillian and Tammy Sawyers, McMillian's girlfriend. McMillian and Sawyers picked McHone up at his house, the home of Wesley, Sr. and Mildred, around 2:00 p.m.[4] J.A. 376-77. They then went to Mount Airy, North Carolina to an ABC store where they purchased a pint of Jack Daniels. The group proceeded to the home of McMillian's brother where they stayed for a short time. Between 4:00 p.m. and 5:00 p.m., they drove to Winston-Salem to go to a mall, after which they went to a Pizza Hut. McMillian and McHone had consumed approximately a pint and half of Jack Daniels by that time.[5] At the Pizza Hut, McMillian and McHone each had a pitcher of beer. They left the Pizza Hut around 9:15 p.m. and went to a service station to use the restroom.

At that time, McMillian started driving back to Mount Airy. Around 10:00 p.m., a state trooper pulled over their car and arrested McMillian for driving while under the influence of alcohol. J.A. 322, 381. The state trooper testified that he observed that McHone had been drinking and asked Sawyers to drive. *Id.* at 328. McMillian was taken to the Dobson, North Carolina police station, and, after following the state trooper back to the station, McHone and Sawyers left and

---

for a time, stored in the evidence locker of the Surry County Sheriff. At some unknown point, it was removed, and has not been seen since. A hearing on the matter was conducted in the state courts and no one had a specific memory of destroying the tape. Its whereabouts are simply a mystery." J.A. 854.

A partial transcript of the tape does exist, and apparently the only discernable comment by McHone is "I killed your Goddamn momma, now kill me." *Id.* Neither the tape nor the transcript was introduced into evidence at trial.

[4]McMillian testified that they did not pick up McHone until 7:15 p.m. that evening, J.A. 319, but given the sequence of events that afternoon and night, the record reflects that Sawyers's testimony on the time they picked up McHone is likely the most accurate.

[5]McMillian already had some alcohol with him in the car and Sawyers was not drinking. J.A. 318, 321.

drove to McHone's house. McHone went into the house and then came back out to the car with a gun and a couple of cassette tapes.[6] He told Sawyers that the gun was to protect her in case McMillian got out of jail that night and tried to hurt her.

They then went to a party at Ronald Speaks's house in Mount Airy arriving around 12:00 a.m.[7] J.A. 385. There, McHone encountered Tammy Long Bryant, who he had met at a Narcotics Anonymous meeting and had been dating for a couple of weeks. They split approximately a fifth of liquor with another person. Bryant testified that McHone consumed more than 1/3 of the fifth but less than 1/2 of it. *Id.* at 333. During the party, McHone pointed his gun at a Johnny Swaim as a result of an argument over Bryant. Then, Sawyers, Bryant, and McHone went back to Sawyers's car and drove to a convenience store to purchase beer for people at the party.[8] While in the car, Bryant took the gun from McHone, which had been unloaded, and placed it in the car's console. They then returned to Speaks's house. Shortly thereafter, Sawyers took McHone home and on the way, they stopped at a convenience store where McHone purchased

---

[6]The State introduced into evidence a .38 caliber pistol found in the kitchen and Sawyers testified that this was the gun that McHone took from the house. However, it is unclear if this is the same or a different gun than the one that Mildred said was missing. Supp. J.A. 22-23. McHone's counsel speculated in closing that this was a different gun because the gun that Mildred said was missing was in the camper with the family during their fishing trip, but McHone, while with Sawyers, retrieved the gun from the house during the time the family was away fishing. *Id.* The State did not introduce any ballistics testimony during the guilt or sentencing phases. *Id.* at 21.

[7]Sawyers testified to their time of arrival at the party, but given that the family returned back from their fishing trip around 12:30 a.m. and McHone was already there, he probably went to the party earlier than 12:00 a.m.

[8]Bryant testified to a different sequence of events, stating that after the fight with Speaks, McHone walked to the convenience store and was gone for several hours. J.A. 336. Bryant testified that after McHone returned, she did go to a convenience store with him and Sawyers to buy beer and that while in the car McHone started beating his head with his fist, hitting the dashboard, and swinging around the gun. *Id.* at 343. She testified that she took the gun away from him and unloaded it. *Id.* at 344.

more beer.[9] He drank two beers in the car, left one in the car, and took the rest into his house. Before getting out of the car, Sawyers testified that McHone "started saying how, how nobody loved him, and how he might as well kill himself, and that because nobody would miss him." *Id.* at 394. He then loaded the gun and asked Sawyers to stay with him so that he could protect her from McMillian but she declined.

The testimony at trial regarding McHone's level of impairment, from alcohol and possible drug use, varied. In general, the witnesses for the State (with the exception of Wesley, Jr., who never acknowledged that McHone had been drinking) testified that while McHone had been drinking, he was not "drunk" or intoxicated to the point that his actions were impaired.[10] Specifically, these witnesses testified as follows:

•  Wendy Adams: Testified that when she first observed McHone at the house after they returned from the fishing trip, he walked normally (did not stagger or stumble) and made it up the steep basement steps. He did not slur his speech but was talking louder than normal. J.A. 122-23. Testified that she had undergone several hours of training in the Air Force to recognize whether an individual is impaired/under the influence. *Id.* at 151. Testified that Wesley, Sr. and Mildred did not talk to McHone in her presence about alcohol or him being drunk when they got home from the fishing trip. *Id.* at 159.

•  William Kent Hall, First medical responder: Testified that when he was in the kitchen with Wesley, Sr.'s body, McHone called out to "Give me a cigarette." *Id.* at 164.

•  Jimmy Inman, Deputy Sheriff, Surry County Sheriff's Department: Testified that he arrived shortly after 2:00 a.m., arrested McHone, and that McHone started "cussing" the Sheriff's depart-

---

[9]Sawyers testified that at the convenience store, Sawyers called Bryant, at McHone's request, to see if Bryant would come home with him. *Id.* at 392. Apparently Bryant declined to do so, but the record is unclear.

[10]Because McHone's *Brady* claims involve much of this testimony, it is recounted in this context, *infra* pg. 44-47.

ment and stating "What have I done? Why did I do it?". *Id.* at 169-171. Testified that McHone recognized the "Air Care" helicopter as it flew in to pick up Mildred and that he stated "Oh, God, it's bad. There's Air Care." *Id.* at 172. Testified that he was able to hear and understand McHone's speech and that McHone was able to respond to his questions. *Id.* at 172-73. Testified that given his experience in law enforcement in observing drunk people, that McHone "was not drunk. He had been drinking." *Id.* at 179. He "define[d] drunk as a person's mental and physical capabilities are impaired to the point that he cannot walk, talk, or act in a proper fashion." *Id.* at 178. He stated that he based his opinion "on [McHone's] smell of alcohol about him, the way he talked to me, and the way he did walk." *Id.* at 180.

• Terry Miller, Detective, Surry County Sheriff's Department: Testified that when he entered the house McHone said, "Terry Miller, you pussy, I'll kill you too, you son-of-a-bitch . . . I know what I've done, and I'll have to pay for it. Why don't you just shoot me and get it over with." *Id.* at 212. Testified that, "Based on the fact that he was able to identify me spontaneously when I entered the room, and I was not that personally acquainted with the man; the fact that I could clearly understand everything that he said; he was very much aware of everyone in his presence and called them by name; he was able to negotiate the steps in front of the house, walk to the patrol car; he was aware of the Air Care helicopter that came over near the same time that we arrived at the patrol car; . . . . Based on everything I observed there the man obviously had been drinking. In my opinion he was not so drunk he did not know what he was doing." *Id.* at 215.

• Larry Norman, Officer, Dobson Police Department: Testified that he observed McHone when he was brought into jail and that he did not slur or mumble his speech and could walk. *Id.* at 220. He testified that, "It was obvious in my opinion that he was drinking, intoxicated. But, he was not drunk as I would term drunk." *Id.* at 221.

• Wesley, Jr.: Testified that McHone was not slurring his speech during his fight with Mildred and Wesley, Sr. and was able to walk and negotiate the basement steps. *Id.* at 241-42. Testified that

McHone seemed to be very aware of what was happening and that his answers to his parents questions were responsive. *Id.* at 251. Testified that he had training on several occasions in the Air Force on detecting alcohol impairment and that, "I neither heard, saw, or felt any type of impairment on his part, on the part of the defendant during that entire time." *Id.* at 282. He explained that, "By impairment I meant that any dysfunction of his physical movements; any slow movement, jerking, stumbling, tripping; any impairment in his voice characteristics by slurring his speech or not being able to finish a sentence; or not being able to recognize me. All the attributes that I looked at and dealt with in extremely close quarters, I did not see any impairment other than what any other normal person would do." *Id.* Testified that he did not notice any odor of alcohol on McHone that night and that "[t]he only indication that I had, the only mention of drinking at all during the argument was the fact that my father told him to go to bed and sleep it off." *Id.* at 290.

Finally, the State presented witnesses who stated that Mildred told them that McHone threatened to kill Mildred when he was twelve to thirteen years old.[11] *Id.* at 307-309.

McHone presented two witnesses, McMillian and Bryant. McMillian testified to the amount of alcohol that he and McHone drank and that McHone was "mush-mouthed," and that his eyes were red and glassy. *Id.* at 314-27. Bryant testified in more detail. She stated that McHone was drunk and staggering when he arrived at the party at Speaks's house; that he was crying and fighting with people, swinging his gun around; and that McHone was real pale, sweating, and moving rapidly with wide eyes. *Id.* at 333-339. Bryant testified that later at the party she asked McHone what he was on and, "he told me that he was eating acid." *Id.* at 340.

The State presented Sawyers as its rebuttal witness. Sawyers testified to the sequence of events, described above, from the time she picked up McHone until she brought him back later that night. She

---

[11]McHone was twenty years old at the time of the trial and, while the record is not specific, presumably was nineteen at the time of the killings. Supp. J.A. 232.

testified that McHone was not slurring his words "much" when she brought him home that night and that he was coherent. *Id.* at 393. When asked whether McHone was drunk in her opinion, she said, "I believe he was. I believe he was. I believe he was sober just a little bit. I mean, he wasn't real drunk, in my opinion, I've seen people drunker." *Id.* at 399. Yet, on cross-examination, Sawyers testified that McHone was steadily getting drunker throughout the night and was acting the most drunk while at Speaks's house. *Id.* at 400-01.

During the jury's deliberations, they twice asked the judge "to go over the law of murder of Wesley Adams, Sr., and six qualifying things that we need to prove for first degree murder." *Id.* at 474, 479. In response, the judge re-read the instructions. The jury returned a verdict finding McHone guilty of first-degree murder in the deaths of both Mildred and Wesley, Sr.

The State did not present any new evidence during the sentencing phase. The defense presented expert testimony concerning McHone's history of substance abuse and diagnosis of adjustment disorder with depressed mood. Dr. James Groce, the State's psychiatrist, testified to this diagnosis, but on cross-examination by the State testified that he had concluded in evaluating McHone that his "intoxication does not appear to be severe enough to make Mr. McHone unable to perform specific intent or to meet the standard for not being responsible for his behavior." *Id.* at 493. Dr. John Warren, McHone's expert, testified that "at the time of the crime [McHone] was intoxicated or impaired, at least to the extent that people around him noticed that he smelled of alcohol and he was acting intoxicated." *Id.* at 503. However, he stated on cross-examination that he could not state how impaired McHone was and that "[o]ne drink will impair a person." *Id.* at 525.

Bobby McHone also testified as to McHone's childhood. He related how under a joint custody agreement between him and Mildred, McHone was exposed to his alcohol use and the related problems it caused in raising McHone. *Id.* at 530-546. A former neighbor of McHone testified that McHone helped her run errands and mow the lawn. *Id.* at 526-28. Finally, a parent of one of McHone's former co-workers testified that McHone once helped her with her car. *Id.* at 528.

The jury found fourteen mitigating factors to exist regarding the killing of Wesley, Sr., and eleven to exist regarding the killing of Mildred.[12] However, for both murders, they also found that the aggravating circumstance that the murders were part of a course of conduct in which McHone engaged and that the course of conduct included the commission of other crimes of violence against others. *Id.* Additionally, they found another aggravating circumstance as to the murder of Wesley, Sr.—that the murder was committed while McHone was engaging in an attempt to commit a homicide on a person other than the deceased.[13] *Id.* They then found the aggravating circumstances to outweigh the mitigating circumstances and recommended that McHone be sentenced to death for both murders. *Id.*

## II.

The court will review "*de novo* a district court's decision on a petition for writ of habeas corpus based on a state court record." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). However, because McHone filed his habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our *de novo* review is limited by the standards set forth by AEDPA. Under AEDPA, if a state court has resolved the merits of a claim for post-conviction relief,[14] a federal court may not issue

---

[12]The jury rejected N.C. Gen. Stat. § 15A-2000f(6) mitigating circumstance: "The capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired." J.A. 579, 583.

[13]The attempted homicide that this aggravating factor is referring to is that of Wesley, Jr. Supp. J.A. 132. While McHone was not charged with the attempted murder of Wesley, Jr., during the charge conference in the sentencing phase the judge found that he could have been so charged so this was a proper aggravating factor. *Id.*

[14]The North Carolina Supreme Court did so in a one-line order without explaining its reasoning, but such an order is still an adjudication "on the merits" for AEDPA purposes. *See Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir. 2000) ("Where, as here, a state court summarily rejects a claim without articulating reasons, its order nevertheless constitutes an 'adjudicat-[ion] on the merits' for purposes of § 2254(d)."). "But because we have no indication of how the state court applied federal law to the facts, we must necessarily perform [our] own review of the record." *Id.* (citations omitted).

a writ of habeas corpus unless the state court's holding was "contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In this case, McHone contends that the state court unreasonably applied clearly established federal law. A state court's adjudication of a claim constitutes an unreasonable application of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions, but unreasonably applies it to the facts of the particular case." *Id.* Because the Supreme Court has stated that an "*unreasonable* application of federal law is different from an *incorrect* application of federal law," *Williams v. Taylor*, 529 U.S. 262, 410 (2000), we may not issue a writ of habeas corpus solely because we determine in our "independent judgment that the state-court decision applied [a Supreme Court] case incorrectly." *Prince v. Vincent*, 538 U.S. 634, 641 (2003)(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)(per curiam)). Thus, to grant McHone's habeas petition we must conclude that the state court's adjudication of his claims was not only incorrect, but that it was objectively unreasonable.

### III.

McHone contends that the state court unreasonably applied *Brady* and *United States v. Bagley*, 473 U.S. 667 (1985), to the facts of his case. In *Brady*, the Supreme Court held that due process requires state agents to disclose evidence favorable to the defendant which is material to guilt or punishment. 373 U.S. at 86. A *Brady* violation contains three elements:

> (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial.

*Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Both impeachment evidence and exculpatory evidence fall within the scope of *Brady*.

*Bagley*, 474 U.S. at 682; *Monroe*, 323 F.3d at 299. Moreover, the prosecution's failure to disclose "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995).

## A.

Because I believe the majority confuses the favorability and materiality prongs in their *Brady* analysis, I write separately.[15] McHone argues that the State failed to reveal favorable evidence from seven witnesses related to whether he killed with the necessary specific intent for first-degree murder. The majority finds that the withheld evidence was not favorable to McHone.

First, McHone points to the pretrial statements of Wesley, Jr. who made statements to the police within hours of the crime indicating that McHone was "obviously drunk" and had a strong odor of alcohol on him but testified at trial that McHone was not impaired and did not smell of alcohol. The majority reasons that these two statements are consistent because in their view Wesley, Jr. maintained in both his pretrial and trial statements that McHone was aware of what he was doing throughout the commission of the murders and was not impaired by alcohol. I cannot agree. Wesley, Jr.'s statements are inconsistent because in Wesley, Jr.'s pretrial statements he told the police that McHone was drunk and smelled strongly of alcohol but he stated at trial that McHone did not smell of alcohol, was not impaired in anyway by alcohol, and that the only indication that he had that McHone had been drinking was that Wesley, Sr. told McHone to go to bed and "sleep it off."[16] J.A. 282, 290.

---

[15]As the majority notes, we assume that the State did not turn over the evidence in question.

[16]The majority places much weight on the distinction between the terms "drunk" and "impairment." Certainly, these terms can have different meanings in a variety of contexts as one may be "drunk" but not suffering from extreme "impairment." Yet it defies reason to believe, as the majority apparently does, that Wesley, Jr.'s trial statements that McHone was not impaired *in any way* by alcohol and did not smell of alcohol are

The extent to which this inconsistent statement would be of impeaching value in undermining Wesley, Jr.'s testimony is a question which goes to materiality under *Brady* but does not detract from the statement's impeaching nature in and of itself. Wesley, Jr.'s undisclosed pretrial statement is not merely "neutral evidence." Rather, it had the potential to alter the jury's assessment of the credibility of Wesley, Jr., a significant prosecution witness. *See United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (discussing the nature of impeachment evidence under *Brady*).

Second, Wendy made statements to the police that Randy Adams told her when they arrived home that night that McHone was drunk; she noted that McHone was always "real smooth" while sober but was cussing and screaming that night, indicating he was drunk; and she also described McHone and Wesley, Sr.'s fight and said that it sounded like Wesley, Sr. was beating McHone and dragging him up the stairs. J.A. 603-609. These pretrial statements, when considered with Wendy's trial statements, would have also been of some impeaching value. Specifically, her trial testimony that McHone did not stagger or stumble his speech, while not directly contradictory to her pretrial statements that McHone was screaming and cussing, could have been characterized in a different light by showing that McHone was upset and speaking angrily. Further, her pretrial statements describing the fight between McHone and Wesley, Sr. as one in which it sounded like Wesley, Sr. was dragging McHone up the stairs and beating on him also would have been of impeachment value given her trial testimony that it sounded like McHone and Wesley, Sr.

---

consistent with his pretrial statements that McHone was "obviously drunk" and smelled strongly of alcohol. While Wesley, Jr. told the police pretrial that McHone "appeared" to be aware of what he was doing, J.A. 619, this statement does equate to a statement that McHone was not impaired in any way by alcohol, as Wesley, Jr. testified at trial. Wesley, Jr.'s characterization of McHone in his pretrial statements as "obviously drunk" and smelling strongly of alcohol underscores this inconsistency. Reading these pretrial statements together, one could infer that Wesley, Jr. thought McHone was drunk but not so impaired that he did not realize what he was doing. However, this was not what Wesley, Jr. testified to at trial, he said that McHone was not impaired in any way by alcohol, which is inconsistent with his pretrial statements.

were having a "scuffle." Finally, her pretrial statement that Randy told her that McHone was drunk would have been of some impeaching value at least to the extent that she would have to explain her statement that she did not "pick up" on Wesley, Sr., Mildred, or Randy thinking that McHone was drunk.[17]

Third, Randy, who was not called as a witness, made statements to the police that Mildred described McHone's condition that night as drugged or drunken and as the "worse I've ever seen him." *Id.* at 622, 660. This latter statement was noted on the state's witness list beside Randy's name. *Id.* Randy also told the police that McHone called on the night of the killings and asked if he could bring a girl to the house and that when Randy said no, McHone threatened to kill him. *Id.* at 622. Randy's statements concerning what Mildred said are favorable to McHone. That other testimony was presented concerning McHone's intoxication does not detract from the exculpatory value of McHone's mother, who was one of the murder victims, believing that McHone was intoxicated. Whether the evidence was simply cumulative, as the majority relies on, when considered with the other trial testimony, may mean it was not "material" under *Brady*, but it does not mean that it is not "favorable." Randy's statement that McHone threatened to kill him does not undermine the favorability of his overall statement to the police, especially in light of the fact that other testimony was presented that McHone threatened to kill himself and others that night. Such testimony could have even been favorable to McHone as it contradicted the State's argument that McHone was targeting Mildred and Wesley, Sr. that night.

Finally, statements by Deputy Sheriff Inman and Hall, the first medical responder, were suppressed.[18] Deputy Sheriff Inman told the

---

[17]The majority notes that Randy's statement to Wendy was inadmissible hearsay and does not bear in any way on Wendy's later observation of McHone. I disagree. The majority fails to consider whether a hearsay exception could have provided for the admission of this evidence. Similarly, the assertion that Randy believing McHone was drunk does not relate to Wendy's personal observations of him, while true, does not detract from the fact that Randy's statements could have been of impeaching value to Wendy's trial testimony concerning what Randy told her.

[18]Statements by Sawyers and Tuttle, McHone's Narcotics Anonymous/ Alcoholic Anonymous ("NA/AA") sponsor, were also suppressed. Saw-

SBI on the morning of the murders that McHone had a strong odor of alcohol on him and that he was not steady on his feet. *Id.* at 602. He testified at trial that he observed McHone walking, talking, and acting in a normal fashion, *id.* at 179-80, and thus his statement that McHone was not steady on his feet would have been of some impeaching value. Hall's undisclosed statement to prosecutors that McHone was screaming and kicking the glass in the patrol car after his arrest, *id.* at 675, was also favorable because it describes McHone's state of mind shortly after the crime as agitated and upset.

B.

The standard for determining whether the favorable evidence withheld is material is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. A defendant can rely on the cumulative effect of all suppressed evidence in determining whether a *Brady* violation has occurred.[19] *Kyles*, 514 U.S. at 436-

---

yers made statements to police that McHone did not talk negatively about his parents the night of the killings. However, because no testimony was presented that McHone had done so that night, only that he had in the past, I would not find this to be favorable.

Tuttle, who McHone called thirty minutes prior to the shootings, told the police that McHone sounded upset, that he was crying and not making much sense. J.A. 610-12. He told the police that McHone said "he thought somebody was gonna die that night." *Id.* Tuttle said that McHone asked if Tuttle could come to see him but that it was NA/AA policy that at least two people went when someone called in such a situation. *Id.* Tuttle was on the state's witness list, but was never called and McHone's trial counsel never interviewed him. I agree with the majority that McHone cannot benefit from Tuttle's statement because he knew he had spoken to Tuttle that night. *See Allen v. Lee*, 366 F.3d 319 (4th Cir. 2004) (noting that defendant cannot benefit from *Brady* if exculpatory material lies where reasonable defendant would have looked).

[19]The State contends that although materiality is assessed collectively in the first instance in a *Brady* analysis, because the inconsistencies about

37; *Monroe*, 323 F.3d at 302. Because McHone alleges that undisclosed *Brady* material affected both the guilt and the sentencing phases, I look at the cumulative effect of the evidence on each phase separately to determine if there is a reasonable probability that the result of the proceeding would be different as constrained by the deference standards of AEDPA.

In considering the effect of the *Brady* material on the guilt phase, the most important question is the effect it would have had on the jury's finding of first-degree murder, which implicitly carried with it a rejection of McHone's defense of voluntary intoxication. Of the seven witnesses whose statements were not produced, Wesley, Jr.'s statement is arguably the most valuable to McHone because it contains a direct contradiction of his trial testimony and because the State relied heavily on Wesley, Jr.'s testimony. Wendy, the only other adult present at the house during the murder, was also a key witness at trial. Her statements to the police indicate that she had some personal knowledge that McHone was impaired. While not a direct contradiction of her trial testimony, the statement would have had some impeaching value, at least to the extent that she would have to explain her statement that she did not "pick up" on Mildred or Randy thinking that McHone was drunk. Wendy also downplayed the fight between Wesley, Sr. and McHone, failing to mention that it sounded like Wesley, Sr. was beating on McHone. If McHone's counsel had Randy's statement and he had testified at trial, the jury could have heard, through a hearsay exception, that Mildred thought McHone's condition was the worst she had ever seen him.

It is more difficult to determine the value of the statements of Deputy Sheriff Inman and Hall. Deputy Sheriff Inman's testimony of McHone as being able to walk, talk and act in a normal fashion would

---

which McHone complains were all presented to the North Carolina Supreme Court, this court should accord AEDPA deference on an item-by-item basis and thus consider each piece of evidence separately. Appellee's Br. at 11. This contention is clearly incorrect. In *Monroe*, this court reiterated that under step three of the *Brady* analysis, determining whether the evidence is material, the evidence is viewed cumulatively. *Id.* at 298.

be somewhat impeached by his earlier statement that McHone was not steady on his feet. Hall's statement describing McHone's erratic behavior in the police car would have added more support to McHone's voluntary intoxication defense but it would probably not have outweighed the impact of Hall's trial testimony—that McHone asked for a cigarette while Hall was with Wesley, Sr.'s body.

Despite the exculpatory and impeaching value of these statements, I do not think that the state court was unreasonable in concluding that in their absence, McHone still received a fair trial. While the cumulative effect of the statements would have been helpful in his voluntary intoxication defense, they were not such that the jury's verdict of first-degree murder is unworthy of confidence. Rather, the statements would have only demonstrated that the witnesses were somewhat downplaying the extent of McHone's impairment—a fact hardly surprising given that all of the witnesses presented testimony favorable to the State (with the possible exception of Sawyers).

In examining the sentencing phase, the withheld statements would have provided more evidence of McHone's intoxication such that the jury *may* have found N.C. Gen. Stat. § 15A-2000f(6), concerning McHone's ability to appreciate his actions, in McHone's favor. But whether the jury, based on these undisclosed statements alone, would have found this in McHone's favor is unclear. In contrast to the extensive failures of McHone's counsel, discussed below, which go not only to McHone's defense of voluntary intoxication but also to his motive and mitigating evidence from his childhood, these undisclosed statements were not of a powerful enough nature to be considered "material" under *Brady*. In this regard, AEDPA's standard that the state court's conclusion must be "objectively unreasonable" must control. While the result of the sentencing proceeding *could* have been different when considering the cumulative effect of these *Brady* materials, the state court was not objectively unreasonable in finding that the jury's decision was worthy of confidence.

### IV.

McHone contends that the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court set forth the test for an ineffective assistance of counsel claim.

First, a defendant must show that defense counsel's performance fell below an objective standard of reasonableness, the proper measure of which is prevailing professional norms. *Id.* at 687-88. Second, a defendant must show that he or she was prejudiced by defense counsel's objectively unreasonable performance. *Id.* at 687.

### A.

In considering McHone's *Strickland* claims, it is clear that McHone's counsel did fall below prevailing professional norms in several areas and that the state court was unreasonable in concluding otherwise.[20] First, despite proffering a defense of voluntary intoxication and possessing undisputed evidence of the amount and types of alcohol that McHone consumed, counsel failed to seek expert testimony on McHone's blood alcohol level. Though the State contends that such a failure is the fault of the expert witness and not counsel, this is not a case in which Petitioner seeks to retry his case based on new expert testimony or challenge the diagnosis of the expert witness, this is a case in which counsel failed to give the expert all the necessary information.[21] As the majority points out, this court has held that

---

[20]While McHone is arguing that counsels' performance was objectively unreasonable in both the guilt and sentencing phases, because the errors affected both phases to varying degrees, I analyze them together here.

[21]Dr. Warren's post-conviction affidavit states:

> I received no specific information regarding the amount and types of alcohol ingested by Mr. McHone during the night of the crime, other than information obtained from my interview of Mr. McHone. I was aware only of conflicting reports regarding whether or not Mr. McHone appeared "drunk" on the night of the crimes.

> . . . .

> Had I been provided this information regarding Mr. McHone's alcohol intake on the night of the crime prior to my testifying at trial, my testimony would have been substantially different. I would have testified at the guilt phase, among other things, that Mr. McHone's capacity to calmly function and plan was severely impaired because he was intoxicated. I would have also testified

no right to effective assistance of expert witnesses exists distinct from the right to effective assistance of counsel, *Poyner v. Murray*, 964 F.2d 1404, 1418 (4th Cir. 1992), however, in this case, McHone's counsel themselves erred by not utilizing their existing experts properly. *But see Thomas v. Taylor*, 170 F.3d 466, 472 (4th Cir. 1999)(finding nothing in record to indicate that trial counsel failed adequately to prepare expert, rather expert himself was unprepared); *Poyner*, 964 F.2d at 1419 (noting that "mere fact that counsel did not shop around for a psychiatrist willing to testify" to more elaborate psychological disorders than did retained expert not ineffective assistance). Moreover, when counsels' actions are examined "from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, their failure becomes more apparent. McHone's *only* viable defense was that he was so intoxicated that he could not form the necessary specific

> that Mr. McHone's mind and reason were so overborn as to render him utterly incapable of forming the specific intent to kill at the time of the commission of the crime. I would have testified that Mr. McHone was unable to reflect about his actions or think about the consequences of his actions at the time of the commission of the crime. I would have testified at the sentencing phase, among other things, that Mr. McHone's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was substantially impaired.

J.A. 677.

The majority relies on the R&R's finding that Dr. Warren could have learned of the amounts of alcohol that McHone consumed from Dr. Groce's report. Dr. Groce's report states that McHone "report[ed] voluntary intoxication [on the day of killings] with one or two joints of marijuana, a fifth of Jack Daniels liquor, five hits of LSD and approximately a case of beer." J.A. 592. This information, given to Dr. Groce by McHone, does not belie Dr. Warren's assertions in his post-conviction affidavit because it is entirely consistent with his affidavit statement that he received no specific information on the amount of alcohol ingested by McHone *other than the information he obtained from McHone himself.* The only information that either Dr. Groce or Dr. Warren had on the amount of alcohol that McHone consumed was from McHone himself and conflicted with statements from other witnesses. Yet, McHone's counsel never sought out this information from the witnesses in advance of trial or presented any of it to Dr. Warren for a blood alcohol analysis.

intent; thus expert testimony forming a scientific basis for this defense would have *greatly* supported his defense.

Second, McHone's counsel failed to interview or present the testimony of Tuttle, the jailors who observed McHone that night, McHone's substance abuse counselors, or McHone's probation officer. The failure to interview Tuttle, the individual with whom he spoke thirty minutes prior to the shootings, is clearly objectively unreasonable. Tuttle was one of the last people to speak with McHone before the shootings and could have offered key testimony on McHone's state of mind.

Likewise, the failure to interview the jailors is unreasonable given that they were in one of the best positions to observe McHone shortly after his arrest. The jailors' affidavits reveal, in direct contradiction to the testimony of the State's law enforcement witnesses, that McHone appeared to have ingested a significant amount of alcohol and/or drugs and was "messed up."[22] J.A. 681, 689. The failure to interview his substance abuse counselors or probation officer is also objectively unreasonable in light of the fact that counsel presented

---

[22]The majority contends that my reliance on the jailors' statements in the context of *Strickland* is "analytically indefensible," *ante* at 27, from my conclusion that statements of *other* witnesses are not material under *Brady*. The majority fails, as it does repeatedly throughout its analysis, to recognize the differing standards for relief under these two claims. Under *Brady*, we take the cumulative effect of the undisclosed statements in determining relief. My determination was that the undisclosed statements were not material because while the cumulative effect of the statements could have been helpful in establishing McHone's defense of voluntary intoxication and in demonstrating an additional mitigating factor in McHone's favor, they were not such that McHone was denied a fair trial in their absence. My reliance on the jailors' statements in the context of *Strickland*, as well as the statements of other witnesses that McHone's counsel failed to interview, is but one piece of the *Strickland* analysis. As I discuss, *infra* at 60, under *Strickland*, we must consider the totality of the mitigating evidence. In this case, that consists of not only counsel's failure to interview key witnesses, but also their failure to seek expert testimony on McHone's blood alcohol content, their failure to object to the prosecutor's closing argument, and their failure to investigate McHone's childhood adequately.

arguments to the jury about McHone's substance abuse problems and family relationship and these witnesses should have at least been interviewed. His substance abuse counselor's affidavit stated that in the counselor's opinion, McHone's actions that night were very out of character and would not have been committed unless McHone was severely intoxicated. *Id.* at 679-80. His probation officer's affidavit noted that McHone had been complying with the terms of his probation and that Mildred and Wesley, Sr. had voiced very few complaints. *Id.* at 571.

   Third, McHone's counsel failed to object to the State's improper closing argument that McHone bore the burden of proof on voluntary intoxication and that his burden was higher than that required by law. Specifically, the prosecutor argued:

> . . . One of the first things I want to talk to you about is the defense of intoxication . . . [i]f we are going to apply that defense to the facts of this case then we really need to, ought to know what it's about. . . .

> . . . Surely, a man can't go out, whether he be that side of the one-eyed Jack or this side of the one-eyed Jack, and drink some alcohol or take some drugs and then kill somebody and walk away with it. Surely, that can't be, can it? Well, you're right. That can't be. It's not just me saying that. That's what it says right here in *State vs. Bunn*, North Carolina Supreme Court, in the spring term of 1973. Said, "The defense to the charge of murder is that he was so drunk that he was utterly incapable of forming a deliberate and premeditated purpose to kill." That's what he said. This is what the Court said about that. . . . "For it to constitute a defense—" And that's just a defense to the first degree murder charge this is what you must show. And the burden is on the defendant to show this, . . . It's his burden to show this, not the State of North Carolina. But his. This is what he has to show. "For it to constitute a defense it must appear that the defendant was not able by reason of the drunkenness to think out beforehand what he intended to do."

J.A. 442-443.

He continued:

> . . . [I]t says in *State vs. Medlin* in Supreme Court of North Carolina. "Evidence must show at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him—" Now this important word, ladies and gentleman of the jury. "— as to render him utterly incapable of forming a deliberate and premeditated purpose to kill." Utterly, it says. Not just drunk. Not just impaired. We're not talking about drunk driving and not being safe to drive an automobile. We're talking about utterly incapable of forming a deliberate and premeditated purpose to kill. "For it to constitute—" Says it right here, ladies and gentleman of the jury. It's not just me. This is what the North Carolina Supreme Courts have said about that defense.
>
> You see, ladies and gentleman, they recognize the abuse you can have with this defense.

*Id.* at 447.

Under North Carolina law, voluntary intoxication can be a defense to first-degree murder by negating the elements of premeditation and deliberation. *State v. Mash*, 372 S.E.2d 532, 536-37 (1988). In *Mash*, the North Carolina Supreme Court held that the trial court's jury instruction was erroneous because to find for the defendant on intoxication, "the jury does not have to conclude that his intoxication rendered Defendant 'utterly incapable' of forming the necessary intent; it need only conclude that because of his intoxication either Defendant did not form the requisite intent or there is at least a reasonable doubt about it."[23] *Id.* at 537. The *Mash* court also found that the jury instruction at issue could lead a rational jury to find that the defendant bore a heightened burden of persuasion, which "would impermissibly and unconstitutionally shift the burden of persuasion on essential ele-

---

[23]The "utterly incapable" language refers to the defendant's burden of production sufficient to convince the judge that he is entitled to a voluntary intoxication jury instruction and is thus inapplicable to the jury's consideration of the intoxication evidence. *Mash*, 372 S.E.2d at 537.

ments of the crime of first degree murder from the state to the defendant."[24] *Id.* Here, the prosecutor made the same argument rejected in *Mash*, which both heightened and shifted the burden of proof on voluntary intoxication to McHone. By failing to object, McHone's counsel were objectively unreasonable.

Finally, McHone's counsel, while presenting some mitigating evidence that revealed a troubled childhood, failed to go further and discover the extent of abuse. Counsel unreasonably limited its investigation to conversations with Bobby McHone and retaining a psychologist to evaluate McHone. Indeed, counsel only put forth three character witnesses at sentencing, his father, a former neighbor, and another woman who hardly knew McHone. As McHone argues, a thorough investigation of McHone's background would have revealed the following:

- McHone has a history of chronic violence from birth through the divorce of his parents.

- McHone's childhood was marked by deprivation.

- McHone's parents agreed to an unconventional custody arrangement where he spent one year with Bobby and one year with Mildred and that while with Bobby he resided in a series of rooming houses and motels, sometimes sleeping in bars while his father drank.

- Due to the effects of his childhood, McHone self-medicated with drugs and alcohol from the age of 12.

---

[24]The *Mash* court noted that "[a] defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the *burden of producing evidence*, or relying on evidence produced by the state, of his intoxication." 372 S.E.2d at 536. (emphasis added). Thus, the burden of persuasion as to the premeditation and deliberation elements of first-degree murder remains with the prosecution.

McHone's counsel were clearly unaware of the extent of his abuse during his childhood because they submitted as a mitigating factor to the jury the statement that McHone "enjoyed a normal childhood until the time his parents separated, and after that, he began abusing alcohol and drugs." This statement could have misled the jury into believing that his parents' divorce triggered his history of substance abuse, when in reality he experienced abuse and deprivation from an early age. This failure to investigate further, given what counsel already knew, was unreasonable. *See Wiggins*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

B.

Undoubtedly, the prejudice prong is more difficult for McHone to meet. Because McHone claims that counsels' errors prejudiced both his guilt and sentencing phases, I analyze them separately.[25]

1.

To demonstrate prejudice at the guilt phase, a defendant must show that there is a reasonable probability, absent the errors, that the factfinder would have a reasonable doubt respecting guilt. *Strickland*, 466 U.S. at 695. Thus, McHone must show that the factfinder would have a reasonable doubt respecting his culpability for the first-degree murder charge, which he could do most readily through his defense of voluntary intoxication.

The failures of counsel to investigate and present evidence of McHone's specific intent, including the failure to obtain expert testimony on McHone's blood alcohol level and to interview Tuttle and the jailors, were substantial. Because of these errors, his counsel were unable to rebut the State's picture that McHone was unimpaired and

---

[25]The majority neither analyzes the prejudicial effect on the guilt and sentencing phases separately nor recognizes the differing standards for showing prejudice in the guilt and sentencing phases of a capital case.

only slightly intoxicated. Specifically, Tuttle and the jailors[26] could have given the jury a first-hand account of McHone's behavior shortly before and after the shootings testifying as to McHone's impairment and emotional state.[27] Instead, the jury was left with the testimony of Wesley, Jr. and Wendy, arguably strong and sympathetic witnesses for the State, and law enforcement officers (Deputy Sheriff Inman and Deputy Miller), who described McHone generally as only slightly impaired, in direct contravention of the jailors affidavits, J.A. 681, 689. More importantly, if counsel had presented testimony of his blood alcohol level, estimated in the post-conviction affidavit of Dr. Brian McMillen, Associate Professor of Pharmacology in the School of Medicine at East Carolina University, at the severely intoxicating blood alcohol concentration of at least 0.286 g/dl at 1:00 a.m. on the night of the shootings, *id.* at 566, such testimony could have created a reasonable doubt about McHone's ability to premeditate and deliberate the murders. Such evidence, unlike the varied descriptions of McHone's state of intoxication that night, would have given the jury analytical, objective evidence of McHone's impairment.

Counsel also failed by not investigating evidence that could help rebut the State's argument concerning McHone's motive. The State argued that McHone had a "plan" to be free of his parents. The most effective rebuttal of that argument would have been evidence of McHone's relationship with Wesley, Sr. and Mildred in the months preceding the shootings. McHone's probation officer offered a post-

---

[26]The majority suggests that the jailors testimony would have been merely cumulative. I disagree. Given that their testimony would have directly contradicted the testimony of the State's other law enforcement officers, that they observed McHone shortly after the crime when he was brought into the jail, and that their observations indicated that McHone was extremely intoxicated and/or high on drugs, I fail to see how such testimony is "cumulative" to the testimony of the other witnesses who said that McHone had been "drinking," but he was not "drunk."

[27]The magistrate judge placed much emphasis on the fact that Tuttle's testimony could have hurt McHone's defense because it would have revealed that McHone was threatening that "someone would die" that night. However, other testimony was presented to that effect, and Tuttle's description of McHone as upset, crying and asking for help would clearly have been more valuable than prejudicial to his defense.

conviction affidavit stating that McHone was following the rules of his probation and that Mildred and Wesley, Sr. did not complain about his behavior. J.A. 571. McHone's substance abuse counselor also offered a post-conviction affidavit which, while conclusory, would have helped rebut the State's theory that McHone had a "plan" with evidence that these actions were very out of character for McHone and that he never expressed animosity towards his family.[28] *Id.* at 679. Tuttle's testimony would have shown that McHone was not threatening his parents that night and was seeking help. Such testimony of McHone's more recent actions would have acted in marked contrast to the State's evidence that Mildred had expressed concerns about McHone threatening her when he was twelve and thirteen years old.

Finally, counsel substantially failed by not objecting to the prosecutor's improper closing argument, which may have confused the jury as to McHone's proper burden on his voluntary intoxication defense. In determining the prejudicial effect of this argument, Fourth Circuit case law on when an improper closing argument violates due process is instructive. The court has noted that such a "determination requires the court to look to 'the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated.'" *Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998) (quoting *Bennett v. Angelone*, 92 F.3d 1336, 1345 (4th Cir. 1996)).

Looking first to the nature of the comments, the prosecutor incorrectly argued to the jury that North Carolina law mandated that McHone had to be "utterly incapable" of forming a deliberate and premeditated purpose to kill to succeed on the defense of voluntary intoxication. North Carolina law holds that this is the proper standard that the judge must consider in deciding whether to submit a voluntary intoxication instruction to the jury. In contrast, the jury must only

---

[28]Again, I must dispute the majority's conclusion that testimony from McHone's substance abuse counselor would have been unhelpful because the jury already knew of McHone's substance abuse problems. The value of this testimony would have been to help rebut the State's theory that McHone's actions were part of a "plan" to be free of his parents by showing that such actions were out of character.

have a reasonable doubt that defendant could form the necessary spe-
cific intent because of his intoxication. The prosecutor also improp-
erly shifted and heightened the burden of proof onto McHone by
stating that McHone bore the burden to show this defense.

The prosecutor's reference to the incorrect standard was not iso-
lated. The trial transcript of the prosecutor's references to North Caro-
lina case law on voluntary intoxication spans several pages and
consistently misstates the law. As noted, McHone's counsel offered
no "opposing argument" to these incorrect references because they did
not object and the judge did not intervene. While the judge did give
a proper jury instruction on this defense, he did not instruct the jury
as to McHone's burden of proof on voluntary intoxication. The
instruction stated:

> Now, members of the jury, as to the defense of voluntary
> intoxication, I instruct you that if you find there is evidence
> which tends to show that the defendant was intoxicated from
> alcohol or other impairing substances at the time of the acts
> alleged in this case then you should consider the following
> instructions: Generally voluntary intoxication from such a
> substance is not legal excuse for crime. However, if you find
> that the defendant was intoxicated from alcohol or other
> impairing substance you should consider whether this condi-
> tion affected his ability to formulate the specific intent
> which is required for a conviction of first degree murder;
> . . . . In order for you to find the defendant guilty of first
> degree murder by premeditation and deliberation you must
> find beyond a reasonable doubt that he killed with malice,
> and in the execution of actual specific intent to kill formed
> after premeditation and deliberation. If as a result of intoxi-
> cation from alcohol or other impairing substance the defen-
> dant did not have a specific intent to kill the deceased in
> either of the three cases, . . . he would not be guilty of such
> offense.

Supp. J.A. 66-67. Given the prosecutor's improper closing argument,
the jury could have believed that they could not consider evidence of
intoxication until McHone showed he was "utterly incapable" of
forming premeditation and deliberation. At the least, the jury could

have been confused on the correct standard given the prosecutor's repeated references to case law and the jury instruction that did not specifically address McHone's burden.

Viewed as a whole, counsels' errors undermine confidence in the outcome of the guilt phase because a reasonable probability exists that but for these errors the jury could have concluded that there was a reasonable doubt about McHone's mens rea for first-degree murder and thus have found him guilty of the lesser-included charge of second-degree murder. Particularly significant in this regard is the weak case that the State had on first-degree murder. The State had no eyewitnesses to the murders and little evidence of motive. Indeed, McHone's actions in threatening to kill others that night undermines the State's argument that McHone had a plan to kill Mildred and Wesley, Sr. Moreover, McHone shot Wesley Sr. while they were engaged in a struggle and when Wesley Sr. lunged for the gun. Contrary to the majority's assertion that McHone is "fanciful" in believing the case to be weak, these facts when considered in combination with counsels' errors, particularly in presenting a defense of voluntary intoxication, demonstrate that the evidence that McHone "premeditated and deliberated" these murders was indeed marginal.[29] In light of the gravity of these errors and their prejudicial effect, I would find that the state court's application of *Strickland* was unreasonable.

## 2.

In the sentencing phase of a capital trial, a defendant establishes prejudice by showing "there is a reasonable probability that, absent

---

[29]The majority's assertion that the State proffered evidence that McHone reloaded the shotgun during the course of killings does not have support in the record before us. The prosecutor, in his closing argument, stated, "Take into consideration this gun was unloaded at one time that night and this defendant reloaded the gun, carried this into the house and reloaded it, and fired it three times." J.A. 461. The gun the prosecutor was referring to was the handgun that McHone shot Mildred with, not the shotgun that he used in his struggle with Wesley Jr. Testimony at trial did show that McHone had reloaded the handgun when he threatened to kill himself while in the car with Sawyers, *id.* at 394, but not that he reloaded any gun during the course of the killings.

[his trial counsel's objectively unreasonable performance], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. To make such a showing, a defendant need not establish a reasonable probability that the entire jury would have voted against the imposition of a death sentence, but rather, that "there is a reasonable probability that *at least one juror* would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)(emphasis added); *Glover v. Miro*, 262 F.3d 268, 275 (4th Cir. 2001)("'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (quoting *Strickland*, 466 U.S. at 694)). In determining whether a defendant has carried his burden of showing there is a reasonable probability that at least one juror would have declined to impose a death sentence if presented with certain mitigating evidence, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. In conducting this prejudice analysis under *Strickland*, the Supreme Court has emphasized that courts must consider the totality of the available mitigating evidence, both evidence presented at trial and the evidence presented in post-conviction proceedings, to determine its effect. *See Williams* (noting that state court's prejudice determination was "unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence"); *Wiggins*, 539 U.S. at 536 (quoting *Williams*). Neither the majority opinion nor the magistrate judge or the State, in its briefs before this court, conducted the proper totality analysis.

In the context of the sentencing phase, counsels' errors are equally, if not more, prejudicial. If the jury rejected McHone's voluntary intoxication defense in the guilt phase, there is a reasonable possibility that at least one juror could have still believed that McHone did not deserve a death sentence because his intoxication prevented him from understanding the criminality of his actions. Here, the fact that the jury rejected N.C. Gen. Stat. § 15A-2000f(6), the capacity of McHone to appreciate the criminality of his conduct and conform it to the law was impaired, is most telling. Evidence of McHone's blood alcohol level and the testimony of Tuttle and McHone's jailors would have been instrumental in arguing that the jury should have found this mitigating factor in McHone's favor.[30] Specifically, Dr. Warren

---

[30]The majority finds that McHone was not prejudiced by counsels' error, if any, in failing to garner expert testimony on McHone's blood

admitted during his sentencing phase testimony on cross-examination that he could not make a conclusion on how much McHone was impaired. The State specifically attacked this statement during its closing arguments in the sentencing phase. As Dr. Warren's affidavit reveals, his testimony would have been much different had he had the information necessary to calculate McHone's blood alcohol level. More importantly, the State's expert, Dr. Groce, admits in a post-conviction affidavit that he no longer has the opinion that McHone could form specific intent.[31]

Counsels' failures to investigate adequately mitigating evidence were also damaging. The charge conference during the sentencing phase is especially significant. In the course of debating whether the

---

alcohol level because the jury unanimously rejected Dr. Warren's sentencing testimony that McHone was entitled to mitigating factor, N.C. Gen. Stat. § 15A-2000f(6), concerning the capacity of McHone to appreciate the criminality of his conduct or conform it to law. However, this conclusion begs the question. The question is whether the jury would have found this factor in McHone's favor with the assistance of expert testimony on his blood alcohol amount. The fact that they did not (and did not have such testimony) is thus instructive in determining the prejudicial effect of counsels' errors.

[31]Dr. Groce's post-conviction affidavit states:

> At Mr. McHone's sentencing trial, I was called to testify as a witness for the defendant as to mitigating circumstances regarding Mr. McHone's drug and alcohol use, as well as other mitigating factors regarding his psychiatric profile. I testified on cross-examination that Mr. McHone's polysubstance abuse disorder affected him at the time of the crime, but that his intoxication was not severe enough to make Mr. McHone unable to form specific intent or to meet the standard for not being responsible for his behavior. . . . Since the trial, I have been shown materials by counsel for the defendant which were attached as exhibits to the defendant's post-conviction motions which I had not seen at the time of the trial. After considering these materials, I no longer have the opinion that Mr. McHone could form the specific intent to kill at the time of the crime. Consequently, I retract that part of my testimony at Mr. McHone's trial.

J.A. 687-88.

mitigating factor that McHone "enjoyed a normal childhood until the time his parents separated, and after that, he began abusing alcohol and drugs," J.A. 580, 584, McHone's counsel argued that Bobby McHone's testimony was the basis for submitting this mitigating factor, Supp. J.A. 116-17. The colloquy is instructive because the prosecutor stated in response that there was only evidence of "*some* hard times" in McHone's childhood, and then the judge stated that "there's some evidence that he saw [Bobby] drinking." *Id.* at 117 (emphasis added). McHone's counsel never interrupted this colloquy or corrected the prosecutor and the judge. Clearly, counsel failed to investigate McHone's childhood adequately because if they had they would have uncovered that Mildred and Bobby's marriage was characterized by physical and mental abuse; that Bobby chronically abused drugs, alcohol, and gambled frequently; and that McHone was exposed to all of this both during the marriage and after his parents' divorce. Rather than the divorce being the event that triggered McHone's troubles,[32] an adequate investigation would have revealed that McHone's childhood was marked by deprivation. While hiring a mitigation investigator would have helped in this endeavor, it was not necessary. Counsel could have instead simply interviewed McHone's family members, neighbors, or friends. However, they failed to do even this, instead only presenting four total witnesses during sentencing, two of whom barely knew McHone. As the *Wiggins* Court described, "the mitigating evidence counsel failed to discover and present in this case is powerful." 529 U.S. at 534.

Such mitigating evidence of McHone's childhood in conjunction with evidence from McHone's probation officer and substance abuse counselors, would have done much to explain how McHone came to shoot his parents. In this respect, McHone's counsel failed utterly. In the prosecutors' closing statements during the sentencing phase, they portrayed McHone as a "bad seed," as a kid that despite a somewhat troubling childhood had always rebelled and mistreated his mother and step-father. *See* Supp. J.A. 155-208. They characterized him as a person that had never accepted the consequences for anything that

---

[32]The prosecutor highlighted this fact in his closing argument, noting that a lot of parents get divorced but this does not mean that one goes "out and kill[s] one of their real parents and their stepfather." Supp. J.A. 165.

he had done and was now trying to use drinking as his excuse. *Id.* They argued that McHone now should face the consequences of killing Mildred and Wesley, Sr.—for killing them just because he wanted to get out from under their "rules." *Id.*

All of these arguments were proper but McHone's counsel had little to rebut them. They could not rebut the assertion that McHone only had a somewhat troubling childhood because they only had the testimony of Bobby, who gave some insight into McHone's childhood but could hardly paint the full picture as he was a main perpetrator of the abuse McHone experienced. They could not rebut the assertion that McHone was using alcohol as a excuse, because without effective expert testimony they only had the testimony of McMillian, Bryant, and Sawyers, none especially believable witnesses, to support his defense of impairment. Lastly, they could not rebut the assertion that McHone had a "plan" to get out from under his parents, the State's explanation for motive, because they had absolutely no evidence about McHone's relationship with Mildred and Wesley, Sr. or his willingness to follow the conditions of his parole. These failures were not strategic and they were not a result of failing to investigate "every conceivable" line of mitigating evidence. *See Wiggins*, 539 U.S. at 533; *Strickland*, 466 U.S. at 690-91. Rather, they were plain and pervasive.

Viewed as a totality, these errors were prejudicial. If McHone's counsel had been able to make these arguments, arguments essential to rebut the State's evidence, there is a reasonable probability that at least one juror after weighing the evidence in mitigation and evidence in aggravation, would have decided that McHone did not deserve death. The state court's conclusion otherwise, given the gravity of these errors and their prejudicial effect, was objectively unreasonable.

## V.

For the foregoing reasons, I concur with the majority's decision to deny relief as to McHone's *Brady* claim but dissent from their decision on his *Strickland* claims. Counsels' plain and pervasive errors in this case prejudiced both McHone's guilt and sentencing phases and the state court was objectively unreasonable in denying relief on McHone's *Strickland* claim.